**UNITED STATES of America, Appellee,**

v.

Anthony SALERNO, a/k/a "Fat Tony," Vincent Di Napoli, a/k/a "Vinnie," Louis Di Napoli, a/k/a "Louie," Matthew Ianniello, a/k/a "Matty the Horse," John Tronolone, a/k/a "Peanuts," Milton Rockman, a/k/a "Maishe," Nicholas Auletta, a/k/a "Nick," Edward J. Halloran, a/k/a "Biff," Alvin O. Chattin, a/k/a "Al," Richard Costa, a/k/a "Richie," and Aniello Migliore, a/k/a "Neil," Defendants.

Matthew Ianniello, a/k/a "Matty the Horse," Vincent Di Napoli, a/k/a "Vinnie," Louis Di Napoli, a/k/a "Louis," Nicholas Auletta, a/k/a "Nick," Edward J. Halloran, a/k/a "Biff," Aniello Migliore, a/k/a "Neil," Anthony Salerno, a/k/a "Fat Tony," and Alvin O. Chattin, a/k/a "Al," Defendants–Appellants.

Nos. 1586, 1601, Dockets 88–1464, 88–1470 to 88–1474, 88–1477, 88–1547, 90–1291, 90–1292, 90–1296, 90–1297, 90–1301, 90–1311, 90–1312 and 90–1351.

United States Court of Appeals, Second Circuit.

Argued May 8, 1991.

Decided June 28, 1991.

Opinion on Remand Aug. 17, 1992.

Howard M. Shapiro, Asst. U.S. Atty., S.D.N.Y., Daniel C. Richman, Sp. Asst. U.S. Atty., S.D.N.Y., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., of counsel), for appellee.

Gustave H. Newman, New York City, Michael E. Tigar, Austin, Tex. (Newman & Schwartz, New York City, of counsel), for defendant-appellant Vincent Di Napoli and on behalf of all defendants-appellants.

Frederick P. Hafetz, New York City (Goldman & Hafetz, of counsel), for defendant-appellant Edward J. Halloran and on behalf of all defendants-appellants.

Patrick M. Wall, New York City, for defendant-appellant Alvin O. Chattin.

Before: PRATT, MINER and ALTIMARI, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

In *United States v. Salerno,* 937 F.2d 797 (2d Cir.1991), we reversed the RICO convictions of Anthony Salerno, Vincent and Louis DiNapoli, Nicholas Auletta, Edward J. Halloran, Alvin O. Chattin, Aniello Migliore, and Matthew Ianniello, based primarily on the district court's refusal to admit, under Fed.R.Evid. 804(b)(1), the exculpatory grand jury testimony of two witnesses, Pasquale J. Bruno and Frederick DeMatteis. We reasoned there that in view of all of the incidents of grand jury testimony—the government's unilateral ability to grant witness immunity before the grand jury and at trial, "the *ex parte* nature of the proceeding, the leading questions by the government, the absence of the defendant, the tendency of a witness to favor the government because of the grant of immunity, the absence of confrontation"—rule 804(b)(1)'s "similar motive" requirement need not be satisfied by defendants seeking to introduce exculpatory grand jury testimony. *Id.* at 807. We ruled that this error, which struck at the heart of the "Construction Case", which in turn "formed the core of the RICO charges", required us to "reverse the convictions of all eight appealing defendants *in toto.*" *Id.* at 808.

The Supreme Court, —— U.S. ——, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992), remanded. Concluding that it could find "no way to interpret the text of Rule 804(b)(1) to mean that defendants sometimes do not have to show 'similar motive'", *id.,* —— U.S. at ——, 112 S.Ct. at 2507, and noting that we had "declined to consider fully the arguments now presented by the parties about whether the United States had such a [similar] motive", the Court remanded to us "for further consideration." *Id.,* —— U.S. at ——, 112 S.Ct. at 2509. On remand, applying the evidentiary standards announced by the Supreme Court and contained in our precedents, we determine that in the grand jury, the government had a motive to examine Bruno and DeMatteis similar to what it would have had if they had testified at trial; therefore, we again conclude that the district court abused its discretion by refusing to admit the grand jury testimony of witnesses Bruno and DeMatteis; thus, the convictions of defendants Vincent DiNapoli, Louis DiNapoli, Nicholas Auletta, Edward J. Halloran, Aniello Migliore, and Alvin O. Chattin are reversed, and the case is remanded to the district court for further proceedings. Defendant Anthony Salerno's appeals, Nos. 88–1477 and 90–1291, are dismissed as moot since he died during the pendency of this appeal. Defendant Matthew Ianniello was severed from the case after our original panel decision; he thereafter pled guilty to an extortion charge before Pierre N. Leval, *Judge,* to whom this case has been re-assigned in the district court; Ianniello's earlier appeals, Nos. 88–1464 and 90–1296, are dismissed as well.

## I.

### A.

The "long and complex" history of this case is set forth in our original panel opinion, 937 F.2d at 799–803, and need not be repeated here. However, since the dispositive issue on remand revolves around the district court's decision not to admit the grand jury testimony of Bruno and DeMatteis, we will focus more intensely on the facts specific to that decision. We explained the factual background to that decision in our original panel opinion:

> Pursuant to its obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government informed defendants Vincent and Louis DiNapoli that Pasquale J. Bruno and Frederick DeMatteis had testified under immunity before the grand jury, and that counsel for the defendants might wish to speak to those witnesses, as they were sources of potentially exculpatory evidence. Both Bruno and DeMatteis were principals in Cedar Park Concrete Construction Corporation ("Cedar Park"), one of the companies alleged to have been a member of the "Club" of concrete contractors.

> At trial, counsel for the defendants called Bruno and DeMatteis to the stand, whereupon each asserted his fifth amendment privilege against self-incrimination. Although requested to do so by defense counsel, the government refused to immunize Bruno and DeMatteis. Defendants then moved the district court to direct the government to furnish copies of the grand jury minutes so that they could introduce the witnesses' grand jury testimony under Fed.R.Evid. 804(b)(1), the "former testimony" exception to the hearsay rule for unavailable declarants.

> After examining privately the grand jury minutes as well as other materials supplied by the government (all of which were transmitted to the district court under seal), and hearing *in camera* arguments from the government about the content and admissibility of the grand jury testimony, Judge Lowe denied the motion. She reasoned that the govern-

ment's motive to examine a grand jury witness is "far different from the motive of a prosecutor in conducting the trial"; thus, she held, the grand jury minutes were inadmissible under rule 804(b)(1).

*United States v. Salerno*, 937 F.2d at 804.

The "Club" referred to above formed the core of the government's case at trial:

> The government presented evidence that the Construction Case defendants [Salerno, both DiNapolis, Auletta, Halloran, Chattin and Migliore] had participated in a scheme to rig the contracts for concrete superstructure work on high-rise buildings in Manhattan where the value of the concrete work was over $2 million. According to the government, Salerno, along with Vincent DiNapoli, orchestrated the scheme. By establishing control over two essential elements of Manhattan-area concrete contractors' work—labor and ready-mix concrete—Salerno and Vincent DiNapoli were able to keep all of the work on these projects within a select group of contractors, called the "Club". The Genovese family allegedly allocated the jobs among these companies by rigging the bids that they submitted. The Genovese family also allegedly controlled the labor market through corrupt union officials, and controlled the ready-mix market by entering into an alliance with defendant Halloran, to whom the Genovese family granted a monopoly for supplying concrete in Manhattan. The Genovese family profited from this scheme because, according to the government, the owner/developers and construction managers paid to it a two percent surcharge on all concrete jobs performed by club members.

*Id.* at 801–02.

At the time we filed our panel opinion, the grand jury minutes of the Bruno and DeMatteis testimony were under seal. Respecting this fact, we did not elaborate on the contents of the grand jury transcripts; we merely noted that "[v]ery generally stated, their grand jury testimony denied any awareness of, let alone participation in, such a 'club'" of concrete contractors. *Id.* at 808. However, during the pendency of

the government's petition for a writ of *certiorari,* we granted the defendants' motion to unseal the grand jury minutes so that they might respond to the petition. At this stage, therefore, we can discuss in greater detail the contents of the grand jury minutes.

### B.

The grand jury initially called Frederick DeMatteis on June 3, 1986. He invoked the fifth amendment in response to all but pedigree questions; the government thereafter granted him use immunity. The grand jury learned that DeMatteis was a builder/developer with his own firm, the Leon D. DeMatteis Construction Corporation (DeMatteis Corporation), which had two locations in Nassau County, New York. He had been in the construction business in and around New York City since 1945. The DeMatteis Corporation had been involved with three other business enterprises between 1980 and 1985—Big Apple Concrete Corporation (a supplier of ready-mix concrete), and Cedar Park Concrete Company and Metro Concrete Company (both of which were concrete superstructure companies). Cedar Park, the principal subject of the grand jury questioning, was involved in a number of concrete projects between 1980 and 1985; the two most pertinent to this appeal were the Libya House on 48th Street in Manhattan, and the EAB Plaza in Uniondale, New York. It was the government's theory that these two projects, among many others, were subject to the two-percent surcharge levied by the "Club". It was further suggested by the government, both before the grand jury and at trial, that Bruno's sudden retirement from Cedar Park was the result of his unwillingness to pay the two-percent tribute on the EAB Plaza construction job.

In DeMatteis's third appearance before the grand jury, on June 19, 1986, the assistant United States Attorney (AUSA), Mark Hellerer, began asking DeMatteis about his knowledge of the bid-rigging "Club":

Q  Did anyone ever tell you directly or indirectly that you were not to bid on that job [the concrete superstructure work at the Jacob A. Javits Convention Center, the subject of count 18 and predicate act 16 of the indictment]?

A  If someone ever told me that, Mr. Hellerer, that would make me do it. No, nobody ever did.

Q  Now, Mr. DeMatteis, have you ever been aware, have you ever become aware of a situation in which concrete construction companies were to pay two percent of the bid price to organized crime figures or unions in order to be allowed to bid on a particular job?

A  No. How would I become aware of that? I'm not a concrete company. Mr. Bruno ran the company.

Q  Mr. —

[A]  Bruno ran Cedar Park. No, I was not aware of it, number one. And when I formed the company, if you recall, I told you, it was specifically to do my work.

Q  Did you ever become aware that Mr. Bruno was paying two percent on each of your jobs to organized crime?

A  No, sir.

Q  You never discussed that with Mr. Bruno?

A  No way. No, sir.

Q  Did you ever become aware that on the Libya House job it was paid?

A  No.

Q  Museum Towers?

A  No.

Q  Did you ever discuss it with anyone else?

A  No.

Q  You never discussed that with anyone else?

A  No way.

Q  That Cedar Park had to pay two percent?

A  No way, and I don't believe that they did.

\*     \*     \*     \*     \*     \*

Q  Mr. DeMatteis, I'm going to read you a small part of a conversation that was intercepted pursuant to court order on August 14th, 1984. Do you know a man by the name of Ralph Scopo?

A  Do I know him personally or by name?

Q  Do you know him by name?

A  Now I do.

Q  When did you first learn who Ralph Scopo was?

A  Reading it in the newspapers.

Q  In all the years you're working in the construction industry, you never heard of Ralph Scopo?

A  Mr. Hellerer, I don't get involved with the construction any more. I believe I explained that to you. I don't know who delegates are, who anybody is.

Q  You don't know who the head of one of the major unions that represents your employees is?

A  I couldn't even—he doesn't represent my employees. I don't do any of the work myself.

Q  Never represented any workers at Cedar [P]ark or Big Apple?

A  Cedar Park, maybe. What union is it?

Q  Concrete and Cement Workers.

A  Then Cedar Park dealt with him.

Q  And you didn't even know who he was? This is a conversation that Mr. Scopo is having with another gentleman in the concrete industry. The other gentleman says, "What happened with Cedar Park with, wasn't that"—Mr. Scopo says, "they didn't pay and they went out of business." The other gentleman says, "but they were supposed to pay, right?" Mr. Scopo says, "but they wouldn't pay. They wanted them to pay and Cedar Park says about New York it's not New York and all that bullshit." He said, "what did he have, that Indian job that time, what the F., it was a small job, it was three, a little better than three million. He paid for that; and he was, and he was all, he says, 'if I got to pay the two points, I quit.' Broke up the whole business but he wouldn't pay for the other job." The other gentleman says, "that guy, he's—" And then Mr. Scopo says, "and they told him if you, if he don't pay for that job, he's not going to get another F–ing job in the city." "He says good and he quit. One guy went to Florida and Jimmy I hear he hooked up with another company or something."

Now Mr. DeMatteis, obviously Mr. Scopo is talking about Cedar [P]ark Concrete, he's talking about Pat Bruno, he's talking about the Libya House job on which the two percent was paid, and he's talking about the EAB job on which the two percent was not paid, and when it wasn't paid, Pat Bruno left the business and closed up shop with you, with Cedar Park. And you're telling us you never discussed with Pat Bruno any payments of two percent?

A  Mr. Hellerer, on my children's lives, no.

Q  You never discussed with any other individual, the payments of two percent?

A  No.

Q  You never heard of the payments?

A  No.

\*     \*     \*     \*     \*     \*

Q  Now, in hiring Joe Conti [to replace Bruno], there was a certain insurance there, wasn't there, Mr. DeMatteis?

A  What do you mean by insurance?

Q  Well, there was insurance against paying two percent on any Metro jobs, isn't that correct?

A  Mr. Hellerer, I got to tell you again, I don't know anything about two percent, whether it be Mr. Bruno or Mr. Conti.

Pasquale Bruno was a major investor in Cedar Park as well as the employee responsible for its day-to-day operations. His grand jury testimony, given on September 11, 1986, under a grant of immunity, was similarly unhelpful to the government's presentation. Like DeMatteis before him, Bruno's story was unshaken by the AUSA's vigorous examination:

Q  Now, you were aware of the existence of a group called "The Club" of concrete contractors: right?

A  Yes.

Q  When did you first become aware of that?

A   When I read this testimony [given to Bruno by his attorneys for review] from Costigan and Sternchos.

Q   Is it your testimony today that you never heard about them before?

A   No.

Q   Never heard about it?

A   Unless it was in the papers or something. If it was mentioned in the papers, then I read about it there.

Q   Did you ever hear about concrete contractors paying—being obliged to pay two percent of their contract price?

A   Only what I read in the papers or this testimony.

Q   Never heard about anything like that before?

A   No.

Q   Never discussed it with anybody?

A   No.

Q   Never paid any money to anybody?

A   That is correct. No.

\*   \*   \*   \*   \*   \*

Q   Isn't it true that Cedar Park paid two percent on the Libya House job?

A   No.

Q   That is not true?

A   No.

Q   Did you ever have any discussions about paying any money on the Libya House job?

A   Never.

Q   With no one?

A   No one.

Q   Inside or outside Cedar Park?

A   Right.

Q   Did you ever talk to Ralph Scopo about it?

A   No.

Q   Vincent DiNapoli [alleged organizer of the "Club" ]?

A   No.

Q   Any representatives of either of those gentlemen?

A   No one. No.

Q   It might interest you to know, Mr. Bruno, that Mr. Scopo has been intercepted under electronic surveillance saying that in fact you did pay two percent on the Libya House job.

A   I can't help that.

Q   You're saying that that is not true?

A   That is correct.

Q   Isn't it a fact that one of the reasons you decided to leave Cedar Park is because in fact you refused to pay two percent on the EAB job.

A   That is not true.

Q   Absolutely untrue?

A   Not true at all.

Q   No basis for that at all?

A   No.

Q   That is your testimony under oath?

A   Yes.

Q   I have explained to you the penalties for perjury previously.

A   I know you have.

Q   And that is still your testimony?

A   Yes.

Q   Did you ever discuss with any of your partners any payments of that nature?

A   No.

### C.

At trial, the defendants called Bruno and DeMatteis to the stand, whereupon each invoked his fifth amendment privilege against self-incrimination. The defendants requested that the government grant the witnesses immunity, but the government declined. The defendants also asked the district court to either immunize or force the government to grant immunity to the witnesses; the district court denied this motion as well.

After the defendants moved the district court to order the government to furnish copies of the grand jury minutes so that they could introduce the Bruno and DeMatteis statements under Fed.R.Evid. 804(b)(1), Judge Lowe conferred with the government's attorneys in her robing room. At the time our initial panel opinion was filed, the transcript of this robing-room conference was sealed, due to the secrecy concerns with the grand jury minutes. However, since the grand jury minutes have been unsealed, there is similarly no reason to keep this *in camera* conference secret.

AUSA Cohen started the conference by telling Judge Lowe that the grand jury testimony of both witnesses "has to be characterized as a denial—they denied any knowledge of any of this stuff." However, AUSA Cohen also told the judge that after Bruno's grand jury appearance, Bruno's counsel had sent the United States Attorney's Office "a letter that said, 'I might have given some false answers in the grand jury in that sea of denials that I gave you to a series of questions, and those answers in some material respect might have been false, and I would like a chance maybe to reanswer specific questions to correct some of those answers.'" The AUSA went on to inform Judge Lowe that "[w]e did not cross-examine Bruno and did not tip our cards, and the same thing was true with respect to DeMatteis". However, most of the remaining *in camera* discussion focused on the trustworthiness, or lack thereof, in Bruno's grand jury testimony. *See* Fed.R.Evid. 804(b)(5).

Shortly thereafter, on February 1, 1988, Judge Lowe issued a written opinion on this evidentiary issue. She concluded, without ever referring to the contents of the grand jury minutes, that "the motive of a prosecutor in questioning a witness before the grand jury in the investigatory stages of a case is far different from the motive of a prosecutor in conducting the trial. The difference in motive to examine or cross-examine prevents the introduction of the grand jury testimony of DeMatteis and Bruno under [Fed.R.Evid.] 804(b)(1)." Noting that there were questions of Bruno's reliability, Judge Lowe explained: "If the government, at trial, was compelled to discredit the grand jury testimony by using the materials under seal, it would be required to publicly disclose information in possession of the grand jury which the government is prevented from disclosing under Fed.R.Crim.P. 6. This Court finds therefore that there is no adequate guarantee of reliability of the grand jury testimony to justify its placement before this jury."

## II.

As the Supreme Court noted, —— U.S. at ——, 112 S.Ct. at 2509, the lone issue on remand is whether the government had a "similar motive to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1).

## A.

The text of the "similar motive" requirement of rule 804(b)(1) inherently requires a comparison between what the examiner's motive was at the time of the prior testimony and what it would be if the witness was actually "available" at the current proceeding. Before the Supreme Court, the government argued that "the government typically does not have the same motive to cross-examine hostile witnesses in the grand jury that it has to cross-examine them at trial." Brief for United States at 11, *United States v. Salerno,* —— U.S. ——, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992). In support of this assertion, the government offered three reasons:

First, the government's examination of witnesses before a grand jury is affected by the need to maintain the security of the grand jury proceeding, a motive entirely distinct from any motive that the government ordinarily has at trial. * * * To confront a witness suspected of perjury in the grand jury with all of the evidence against him threatens to expose the status of the investigation at the time of the testimony, including the identities of informants, the scope of physical and electronic surveillance in connection with the investigation, and the nature of other investigative techniques being employed.

\* \* \* \* \* \*

Second, in the grand jury setting the government ordinarily has little incentive to discredit a perjurious witness with a vigorous, on-the-spot examination. By simply excusing the witness and continuing the grand jury's investigation, the government retains the options of prosecuting the witness for perjury, or recalling the witness for further examination when the investigation produces more evidence with which to confront him.

Third, the issues before the grand jury at the time a witness has testified will not necessarily be the same as those presented during the trial on an indictment handed down by that grand jury. * * * Thus, while the ultimate issue before the grand jury is whether there is probable cause to believe that a crime has been committed, the scope and nature of the crime and the identities of the potential participants may well not have crystallized at the time a particular witness testifies before the grand jury.

Brief for United States at 11–12, 13–14, *United States v. Salerno*, —— U.S. ——, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992). The government presses these same considerations of policy on remand.

The Supreme Court has made clear in recent years that the Federal Rules of Evidence are to be treated like any other statute; that is, they are to be read with regard to their "plain meaning". *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 178–79, 107 S.Ct. 2775, 2780, 97 L.Ed.2d 144 (1987); Edward R. Becker & Aviva Orenstein, *The Federal Rules of Evidence After Sixteen Years—The Effect of "Plain Meaning" Jurisprudence, the Need for an Advisory Committee on the Rules of Evidence, and Suggestions for Selective Revision of the Rules*, 60 Geo.Wash.L.Rev. 857, 864–68 (1992). Since the term "similar motive" is not defined within the Federal Rules, we must give that term its plain meaning, unless that reading would lead to an absurd or unconstitutional result. *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 510, 109 S.Ct. 1981, 1985, 104 L.Ed.2d 557 (1989).

The word "similar" means "having characteristics in common", "very much alike", or "comparable". *Webster's Third New International Dictionary* 2120 (1971). It does not, however, mean "identical". *Murray v. Toyota Motor Distrib. Inc.*, 664 F.2d 1377, 1379 (9th Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2905, 73 L.Ed.2d 1314 (1982); *United States v. Salerno*, —— U.S. at ——, 112 S.Ct. at 2509 (Blackmun, J., concurring); David F. Binder, *Hearsay Handbook* § 26.05, at 408 (3d ed. 1991). *See also In re Johns–Manville/Asbestosis*

*Cases*, 93 F.R.D. 853, 857 (N.D.Ill.1982). Likewise, the word "motive" means "something within a person * * * that incites him to action". *Webster's Third New International Dictionary* 1475.

The text of rule 804(b)(1) makes clear that "opportunity" to examine is not enough; the "similar motive" requirement ensures that the "opportunity" was a "meaningful" one. Thus, we have said that "the issues in the two proceedings [must be] sufficiently similar to assure that the opposing party had a meaningful opportunity to cross-examine when the testimony was first offered." *United States v. Wingate*, 520 F.2d 309, 316 (2d Cir.1975) (decided prior to, but citing, rule 804(b)(1), which came into effect on July 1, 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). *Accord United States v. Miller*, 904 F.2d 65, 68 (D.C.Cir.1990) ("Before the grand jury and at trial, [the witness's] testimony was to be directed to the same issue—the guilt or innocence of [the targets]."); 2 *McCormick on Evidence* § 304, at 315 (4th ed. 1992) ("similar motive" requires, "[a]t most, the issue on which the testimony was offered in the first [proceeding] must be the same as the issue upon which it is offered in the second."); V *Wigmore on Evidence* § 1387, at 91 (Chadbourn rev. 1974) ("The *issue* on the occasion when the former testimony or deposition was given must have been substantially the same, for otherwise it cannot be supposed that the former statement was sufficiently tested for cross-examination upon the point now in issue.") (emphasis in original); 2 Steven A. Saltzburg & Michael M. Martin, *Federal Rules of Evidence Manual* 400 (5th ed. 1990) ("The way to determine whether or not motives are similar is to look at the similarity of the issues and the context in which the opportunity for examination previously arose."). *Cf. United States v. Salerno*, 937 F.2d at 806 (the similarity of motive requirement assures "that the earlier treatment of the witness is the rough equivalent of what the party against whom the statement is offered would do at trial if the witness were available to be examined by that party.").

### B.

█ Our own cases dealing with the "similar motive" requirement of rule 804(b)(1) have indicated that in determining similarity of motive the court should look first to what examination *in fact* occurred at the prior proceeding, in order to determine whether the prior examination was "the equivalent of what would now be done if the opportunity [to examine] were presented", Fed.R.Evid. 804 advisory committee's note, 56 F.R.D. 183, 323 (1972); actual conduct is a competent indicator of motive. *Cf.* Fed.R.Evid. 608(b). If that initial inquiry is not conclusive, the court should then turn to an objective inquiry, asking whether a reasonable examiner under the circumstances would have had a similar motive to examine the witness. This latter inquiry ensures that the failure to vigorously examine the witness—for tactical reasons or otherwise—does not insulate the prior testimony from admission. *See, e.g., United States v. Zurosky,* 614 F.2d 779, 791–93 (1st Cir.1979) (testimony of co-defendant at prior suppression hearing admissible at trial even though defendant declined to cross-examine co-defendant at hearing), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980); *United States v. Salerno,* —— U.S. at ——, 112 S.Ct. at 2511 (Stevens, J., dissenting).

In addition to *Wingate, supra,* we discussed "similar motive" in *United States v. Serna,* 799 F.2d 842 (2d Cir.1986), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987):

> Cinnante and Serna also argue that the trial judge erred in excluding hearsay evidence from the transcript of Chupurdy's testimony at his trial. Chupurdy had testified that he did not attend any meeting at the House of Pancakes and that he did not know either Serna or "Steven." The same Assistant United States Attorney prosecuted both Chupurdy and Serna and Cinnante, and Castellon testified in both trials about the House of Pancakes meeting. Appellants contend that Chupurdy's testimony fits within the hearsay exception of Fed. R.Evid. 804(b)(1). However, the rule requires that the declarant be unavailable as a witness and the Government have had an opportunity and similar motive to cross-examine the witness at the previous trial. * * * Chupurdy indicated through his attorney that he would invoke the Fifth Amendment. * * * Because Castellon's credibility was a key issue in Chupurdy's case, the prosecutor arguably had a motive to cross-examine Chupurdy on his claim that he had not attended a House of Pancakes meeting. However, since cross-examination was unlikely to shake Chupurdy's denial of such a meeting, the prosecutor, wisely, we think, chose to focus his cross-examination on the details of Chupurdy's transportation of the container to show that his claim of ignorance of its contents was unbelievable, rather than to emphasize to the jury Chupurdy's denial of any House of Pancakes meeting.

*Id.* at 849. In these circumstances, we concluded in *Serna* that "the prosecutor had no real motive to explore Chupurdy's earlier statements", *id.* at 850, since the earlier examination was not in fact the rough equivalent of what would have been done at trial. In contrast, as we demonstrate below, the prosecutors here in fact exercised their opportunity to examine Bruno and DeMatteis in a meaningful manner. *See also United States v. Salim,* 855 F.2d 944, 954 (2d Cir.1988) ("similar motive" satisfied where examiner had "full and fair opportunity" to test the truth of the declarant's statements).

The seventh circuit has held that the "similar motive" requirement is satisfied if the prior statements were "subject to the scrutiny of a party interested in thoroughly testing its validity." *United States v. Pizarro,* 717 F.2d 336, 349 (7th Cir.1983). Likewise, in *Zenith Radio Corp. v. Matsushita Elec. Ind. Co.,* 505 F.Supp. 1190 (E.D.Pa.1980), then-District Judge Becker suggested three criteria for ascertaining similarity of motive: the similarity of issues between the two proceedings, the purpose for which the testimony was offered in each proceeding, and the context or circumstances in which the testimony was given. *Id.* at 1252.

Nevertheless, as we have noted, the court need not turn to abstract notions of "motive" if what the examiner *actually did* in the prior proceeding was "similar" to what the examination would be in the current one. Our decisions, most notably *Serna*, indicate that this is the preferred inquiry. Indeed, the government agrees that "a particularized inquiry into the facts and circumstances surrounding the prior examination" is of utmost importance. Brief for United States at 181, *United States v. Salerno*, 937 F.2d 797 (2d Cir. 1991). If the examination at the prior proceeding provided the rough equivalent of what cross-examination would be at the current proceeding, then the "similar motive" requirement is satisfied, and the court need not address the elusive issue of motive in the abstract.

### C.

■ It is undisputed that the government had the "opportunity" to examine Bruno and DeMatteis in front of the grand jury; indeed, the nature of grand jury practice is such that the government is the only party which may ever avail itself of that opportunity. The question that we must answer is whether that opportunity was a "meaningful" one, affording "full and fair" examination which "thoroughly test[s]" the validity of the witnesses' testimony. We conclude that not only was the opportunity a meaningful one, but it was exercised in a meaningful fashion as well.

The government's arguments are long on policy considerations and generalities about grand jury practice, but short on specific facts. *Compare United States v. Poland*, 659 F.2d 884, 896 (9th Cir.) (*per curiam*), *cert. denied*, 454 U.S. 1059, 102 S.Ct. 611, 70 L.Ed.2d 598 (1981). As matters of broad policy, the three arguments presented by the government are best left for another day, since, as a matter of fact, the major premise of each argument is absent on the concrete facts of this case. Indeed, the Supreme Court implicitly and necessarily rejected the government's three abstract policy arguments, for it remanded the case for further proceedings with refer-

ence to the "similar motive" inquiry, rather than reversing and reinstating the judgments of the district court. But even considering the government's policy arguments at face value, we conclude that the government's questioning of Bruno and DeMatteis before the grand jury "comported with the principal *purpose* of cross-examination: to challenge 'whether the declarant was sincerely telling what he believed to be the truth, whether the declarant accurately perceived and remembered the matter he related, and whether the declarant's intended meaning is adequately conveyed by the language he employed.'" *Ohio v. Roberts*, 448 U.S. 56, 71, 100 S.Ct. 2531, 2541, 65 L.Ed.2d 597 (1980) (emphasis in original) (quoting David S. Davenport, *The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis*, 85 Harv.L.Rev. 1378, 1378 (1972)).

First, it is obvious from the portions of the grand jury testimony reproduced above that the government examined Bruno and DeMatteis extensively on the issue of whether a "Club" of concrete contractors in fact existed, and when the AUSA believed that the witnesses were perjuring themselves, he confronted each of them with the intercepted conversation of Ralph Scopo. Thus, the facts undermine the government's first proffered reason for affirmance, because the government's examination of both witnesses exposed "the status of the investigation", "the identities of informants", and at least some of the "electronic surveillance in connection with the investigation". To borrow AUSA Cohen's terminology, the government, indeed, "tipped its cards" before each of these witnesses.

Second, the government's proffered contention that it "ordinarily has little incentive to discredit a perjurious witness with a vigorous, on-the-spot examination" in the grand jury room, is similarly inapplicable on these facts. Although the government claimed that it has "little or no incentive to conduct a thorough cross-examination of Grand Jury witnesses who appear to be falsifying their testimony", *see United States v. Salerno*, 937 F.2d at 806, its

conduct belies this assertion. As the excerpts from the grand jury minutes reprinted above indicate, the AUSA made vigorous, on-the-spot examinations of both Bruno and DeMatteis when each denied awareness of the existence of the "Club". On this and other bid-rigging issues, the AUSA confronted them with the wiretaps of Scopo, statements of cooperating witnesses, and the contents of subpoenaed documents; he invoked ridicule and sarcasm, both legitimate devices of cross-examination; he reminded both of the penalties for perjury; and he even exceeded the bounds of proper trial cross-examination by questioning their reliance on the fifth-amendment privilege. Finally, the AUSA flatly told Bruno that "[t]here is strong concern on the part of the grand jury that your testimony here has not been truthful today."

Third, the primary issue on which Bruno and DeMatteis were examined before the grand jury—the existence of the "Club" of concrete contractors—was precisely the same issue which made up the core of the government's case at trial. *See United States v. Salerno*, 937 F.2d at 799, 802, 808, 814–15. Professor McCormick saw "similarity of issues" as the touchstone of the prior testimony exception, and the advisory committee's notes indicate that congress adopted this view when it framed rule 804. Thus, whatever strength the government's "dissimilarity of issues" argument might have in another case, it is absent on the facts of this particular one. *Accord United States v. Salerno*, —— U.S. at ——, 112 S.Ct. at 2510, 2512 (Stevens, J., dissenting).

In sum, it is apparent from the grand jury minutes that the government's examination of both Bruno and DeMatteis was the equivalent of what would have been done if the opportunity to examine them had been presented at trial. The government was afforded a full and fair opportunity to test the truth of these declarants' testimony, which it vigorously exercised. We conclude that the government had a similar motive, which it in fact acted upon, to examine these witnesses before the grand jury; thus, the grand jury testimony of Bruno and DeMatteis should have been admitted under rule 804(b)(1).

### D.

We previously held that the exclusion of this grand jury testimony was so material and so central to the government's case in this "megatrial" that all convictions had to be reversed. *United States v. Salerno*, 937 F.2d at 808–09. We reject the government's attempt to resurrect the same "harmless error" argument that we previously rejected, *see id.* at 808–09, and we adhere to our prior view that this exclusion "tainted" the entire case. Accordingly, we reverse the convictions of all appealing defendants *in toto*, with the exceptions of defendant Salerno, whose death renders his appeals moot, and defendant Ianniello.

### III.

In view of our holding, we need not address the other arguments advanced by the parties. The convictions of Vincent DiNapoli, Louis DiNapoli, Nicholas Auletta, Edward J. Halloran, Alvin O. Chattin, and Aniello Migliore are reversed, and the case is remanded for further proceedings. The appeals in numbers 88–1464, 88–1477, 90–1291, and 90–1296, are dismissed.