George C. Pratt, Circuit Judge, filed dissenting opinion in which Miner and Altimari, Circuit Judges, joined.

Miner, Circuit Judge, filed dissenting opinion in which George C. Pratt and Altimari, Circuit Judges, joined.

**UNITED STATES of America, Appellee,**

v.

**Vincent DiNAPOLI, Louis DiNapoli, Nicholas Auletta, Edward Halloran, Aniello Migliore, and Alvin O. Chattin, Defendants–Appellants.**

Nos. 1587 to 1591, 1593 to 1595 and 1598 to 1601, Dockets 88–1464(L), 88–1470 to 88–1474, 88–1547, 90–1291, 90–1292, 90–1301, 90–1311, 90–1312 and 90–1351.

United States Court of Appeals,
Second Circuit.

Argued Feb. 17, 1993.

Decided Nov. 1, 1993.

Michael E. Tigar, Austin, TX, Gustave H. Newman, Newman & Schwartz, New York City, for defendant-appellant Vincent DiNapoli.

Robert L. Ellis, New York City, for defendant-appellant Louis DiNapoli.

Marvin Segal, Segal & Hundley, New York City, for defendant-appellant Auletta.

Frederick P. Hafetz, Adam Thurschwell, Susan R. Necheles, Goldman & Hafetz, New York City, for defendant-appellant Halloran.

Walter Loughlin, Mudge Rose Guthrie Alexander & Ferdon, New York City, for defendant-appellant Migliore.

Patrick M. Wall, New York City, for defendant-appellant Chattin.

Mark R. Hellerer, Sp. Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., Paul G. Gardephe, James E. Johnson, Asst. U.S. Attys., Daniel C. Richman, Special Asst. U.S. Atty., New York City, on the brief), for appellee.

Before: NEWMAN, Chief Judge, KEARSE, CARDAMONE, WINTER, PRATT, MINER, ALTIMARI, MAHONEY, WALKER, McLAUGHLIN and JACOBS, Circuit Judges.

JON O. NEWMAN, Chief Judge:

On this criminal appeal, which is before our Court on remand from the Supreme Court, we have given in banc consideration to a fairly narrow issue of evidence that has potentially broad implications for the administration of criminal justice. The issue concerns Rule 804(b)(1) of the Federal Rules of Evidence, which provides that testimony given by a currently unavailable witness at a prior hearing is not excluded by the hearsay rule if "the party against whom the testimony is now offered ... had an opportunity and *similar motive to develop the testimony* by direct, cross, or redirect examination." Fed. R.Evid. 804(b)(1) (emphasis added). Our precise issue is whether the prosecution had a "similar motive to develop" the testimony of two grand jury witnesses compared to its motive at a subsequent criminal trial at which the witnesses were unavailable. We hold that the "similar motive" requirement of Rule 804(b)(1) was not met and that the witnesses' grand jury testimony, offered by the defendants, was therefore properly excluded. Having decided the sole issue for which in banc consideration was ordered, we return the appeal to the panel to which it was assigned for consideration of remaining issues.

## Background

The facts concerning this case have been recounted in prior decisions of this Court, see *United States v. Salerno*, 974 F.2d 231, 232–37 (2d Cir.1992); *United States v. Salerno*, 937 F.2d 797, 799–803 (2d Cir.1991); *United States v. Salerno*, 868 F.2d 524, 527–29 (2d Cir.1989), and we therefore focus only on the details that concern the pending issue. Briefly, the case concerns conspiracy and substantive charges under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d) (1988), against several defendants accused of participating in a bid-rigging scheme in the concrete construction industry in Manhattan. The trial evidence indicated the existence of a "Club" of six concrete construction companies that during 1980–1985 rigged the bids for concrete superstructure work on nearly every high-rise construction project in Manhattan involving more than $2 million of concrete work. Organized crime figures, notably members of the Genovese Family, orchestrated the scheme and enforced adherence to the bid allocations.

The grand jury investigating the matter returned its first indictment on March 20, 1986. That indictment alleged the essential aspects of the criminal activity and named all of the appellants as defendants. The grand jury continued its investigation in an effort to identify additional participants and additional construction projects that might have been victimized by the bid-rigging scheme. In this subsequent phase of the inquiry, the

grand jury called Frederick DeMatteis and Pasquale Bruno as witnesses. They had been principals in Cedar Park Concrete Construction Corporation ("Cedar Park"), a company that other grand jury witnesses had testified had been briefly involved in the scheme. DeMatteis and Bruno, both testifying under grants of immunity, denied awareness of a bid-rigging scheme.

DeMatteis testified in the grand jury on three occasions in 1986—June 3, June 12, and June 19. His first two appearances primarily concerned background questioning about the construction industry and Cedar Park. At his third appearance, the prosecutor pointedly asked whether DeMatteis had been instructed not to bid on the Javits Convention Center project and whether he was aware of an arrangement whereby the successful bidder paid two percent of the bid price to organized crime figures. DeMatteis denied both the instruction not to bid and awareness of the two percent arrangement. The prosecutor, obviously skeptical of the denials, pressed DeMatteis with a few questions in the nature of cross-examination. However, in order not to reveal the identity of then undisclosed cooperating witnesses or the existence of then undisclosed wiretapped conversations that refuted DeMatteis's denials, the prosecutor refrained from confronting him with the substance of such evidence. Instead, the prosecutor called to DeMatteis's attention the substance of only the one relevant wiretapped conversation that had already become public—a tape played at a prior trial, *United States v. Persico,* 84 Cr. 809 (JFK) (S.D.N.Y.1984).

Bruno testified at the grand jury on September 11, 1986. Much of the questioning concerned the operations of Cedar Park. Like DeMatteis, Bruno was asked about and denied knowledge of the "Club" and the two percent arrangement for successful bidders. And, like DeMatteis, he was briefly cross-examined and confronted with the contents of the publicly disclosed tape from the *Persico* trial but not with any of the information from undisclosed witnesses or wiretaps. After his denials and after giving an answer that sharply conflicted with an answer given by DeMatteis,[1] Bruno was briefly excused from the grand jury room. Upon his return, after the prosecutor had consulted with the grand jury, he was told by the prosecutor of the grand jury's "strong concern" that his testimony had "not been truthful." Four days later, Bruno's lawyer wrote the prosecutor stating that many of Bruno's answers had been inaccurate. The lawyer suggested that the prosecutor should resubmit his questions to Bruno in writing and that Bruno would respond by affidavit. The prosecutor declined the suggestion.

A thirteen-month trial on a superseding indictment, filed April 7, 1987, commenced April 6, 1987, against eleven defendants, and ended on May 4, 1988, with the convictions of nine defendants, including the six appellants, Vincent DiNapoli, Louis DiNapoli, Nicholas Auletta, Edward J. Halloran, Alvin O. Chattin, and Aniello Migliore.[2] During the trial, the defendants endeavored to call DeMatteis and Bruno as witnesses. Both invoked the privilege against self-incrimination. The defendants then offered the testimony DeMatteis and Bruno had given to the grand jury. After examining sealed affidavits presented by the prosecution, the District Court (Mary Johnson Lowe, Judge) refused to admit the grand jury testimony as prior testimony under Rule 804(b)(1). Judge Lowe appears not to have made specific findings with respect to the grand jury testimony. Instead, she ruled generally that the "motive of a prosecutor ... in the investigatory stages of a case is far different from the motive of a prosecutor in conducting the trial" and hence the "similar motive" requirement of Rule 804(b)(1) was not satisfied.

---

1. DeMatteis had testified that he had become partners with Paul Castellano's son-in-law, known as Joseph Conti, only after Bruno had interviewed Conti and assured DeMatteis of Conti's expertise. Bruno denied having interviewed Conti and claimed to have no idea of Conti's experience in the concrete industry.

2. One of the convicted defendants, Anthony Salerno, died during the pendency of this appeal, and another subsequently pled guilty to an extortion conspiracy charge. *See United States v. Salerno,* 974 F.2d at 232.

On a prior consideration of the appeal,[3] the panel reversed the convictions and ordered a new trial on the ground that it was error to exclude the witnesses' grand jury testimony. *United States v. Salerno*, 937 F.2d 797 (2d Cir.1991). Though stating that "we agree that the government may have had no motive before the grand jury to impeach the allegedly false testimony of Bruno and DeMatteis," *id.* at 806, the panel ruled that the "similar motive" requirement of Rule 804(b)(1) need not be met because the witnesses were "available" to the prosecution at trial through a grant of immunity, *id.* The panel subsequently denied rehearing after making a slight revision of its opinion, *United States v. Salerno*, 952 F.2d 623 (2d Cir.1991), and rehearing in banc was denied by a divided vote, *United States v. Salerno*, 952 F.2d 624 (2d Cir.1991).

Thereafter, the Supreme Court reversed the panel's reversal of the convictions. *United States v. Salerno*, —— U.S. ——, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992). The Supreme Court ruled that all of the requirements of Rule 804(b)(1) must be met, including the "similar motive" requirement. The Court declined to decide whether the "similar motive" requirement was satisfied in this case, believing it "prudent to remand the case for further consideration" of that issue. *Id.* at ——, 112 S.Ct. at 2509. In dissent, Justice Stevens reached the "similar motive" issue and concluded that a similar motive was present in this case. *Id.* at ——, 112 S.Ct. at 2509–12.

Upon remand, the panel ruled that the "similar motive" requirement was satisfied. *United States v. Salerno*, 974 F.2d 231 (2d Cir.1992). The panel considered the questioning of the witnesses conducted by an Assistant United States Attorney and concluded that what occurred "was the equivalent of what would have been done if the opportunity to examine them had been presented at trial." *Id.* at 241.

**3.** Previously this Court had bifurcated the appeal to permit early consideration of a claim of improper jury contact and had remanded for factfinding concerning that claim. *See United States v. Ianniello*, 866 F.2d 540 (2d Cir.1989). After a hearing before then Chief Judge Brieant, the

## Discussion

■ Our initial task is to determine how similarity of motive at two proceedings will be determined for purposes of Rule 804(b)(1). In resolving this matter, we do not accept the position, apparently urged by the appellants, that the test of similar motive is simply whether at the two proceedings the questioner takes the same side of the same issue. The test must turn not only on whether the questioner is on the same side of the same issue at both proceedings, but also on whether the questioner had a substantially similar interest in asserting that side of the issue. If a fact is critical to a cause of action at a second proceeding but the same fact was only peripherally related to a different cause of action at a first proceeding, no one would claim that the questioner had a similar motive at both proceedings to show that the fact had been established (or disproved). This is the same principle that holds collateral estoppel inapplicable when a small amount is at stake in a first proceeding and a large amount is at stake in a second proceeding, even though a party took the same side of the same issue at both proceedings. *See, e.g., Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1171 (5th Cir.Unit A Dec.1981); *Restatement (Second) of Judgments* § 28, cmt. j (1982). This suggests that the questioner must not only be on the same side of the same issue at both proceedings but must also have a substantially similar degree of interest in prevailing on that issue.

■ Whether the degree of interest in prevailing on an issue is substantially similar at two proceedings will sometimes be affected by the nature of the proceedings. Where both proceedings are trials and the same matter is seriously disputed at both trials, it will normally be the case that the side opposing the version of a witness at the first trial had a motive to develop that witness's testimony similar to the motive at the second trial. The opponent, whether shouldering a

claim was rejected. *See United States v. Ianniello*, 740 F.Supp. 171, 195 (S.D.N.Y.1990). The rejection of that claim is among the issues that remain for panel consideration after this in banc proceeding is concluded.

burden of proof or only resisting the adversary's effort to sustain its burden of proof, usually cannot tell how much weight the witness's version will have with the fact-finder in the total mix of all the evidence. Lacking such knowledge, the opponent at the first trial normally has a motive to dispute the version so long as it can be said that disbelief of the witness's version is of some significance to the opponent's side of the case; the motive at the second trial is normally similar.

The situation is not necessarily the same where the two proceedings are different in significant respects, such as their purposes or the applicable burden of proof. The grand jury context, with which we are concerned in this case, well illustrates the point. If a prosecutor is using the grand jury to investigate possible crimes and identify possible criminals, it may be quite unrealistic to characterize the prosecutor as the "opponent" of a witness's version.[4] At a preliminary stage of an investigation, the prosecutor is not trying to prove any side of any issue, but only to develop the facts to determine if an indictment is warranted. Even if the prosecutor displays some skepticism about particular testimony (not an uncommon response from any questioner interested in eliciting the truth), that does not mean the prosecutor has a motive to show the falsity of the testimony, similar to the motive that would exist at trial if an indictment is returned and the witness's testimony is presented by a defendant to rebut the prosecutor's evidence of guilt.

Even in cases like the pending one, where the grand jury proceeding has progressed far beyond the stage of a general inquiry, the motive to develop grand jury testimony that disputes a position already taken by the prosecutor is not necessarily the same as the motive the prosecutor would have if that same testimony was presented at trial. Once the prosecutor has decided to seek an indict-

ment against identified suspects, that prosecutor may fairly be characterized as "opposed" to any testimony that tends to exonerate one of the suspects. But, because of the low burden of proof at the grand jury stage, even the prosecutor's status as an "opponent" of the testimony does not necessarily create a motive to challenge the testimony that is *similar* to the motive at trial. At the grand jury, the prosecutor need establish only probable cause to believe the suspect is guilty. By the time the exonerating testimony is given, such probable cause may already have been established to such an extent that there is no realistic likelihood that the grand jury will fail to indict. That circumstance alone will sometimes leave the prosecutor with slight if any motive to develop the exonerating testimony in order to persuade the grand jurors of its falsity.

Moreover, the grand jury context will sometimes present additional circumstances that render the prosecutor's motive to challenge the exonerating testimony markedly dissimilar to what the prosecutor's motive would be at trial. Frequently the grand jury inquiry will be conducted at a time when an investigation is ongoing. In such circumstances, there is an important public interest in not disclosing prematurely the existence of surveillance techniques such as wiretaps or undercover operations, or the identity of cooperating witnesses. The results of such techniques and the statements of such witnesses might be powerful ammunition to challenge the grand jury witness's exonerating testimony. By the time of trial, however, the public interest in not disclosing such ammunition will normally have dissipated, and the prosecutor will have a strong motive to confront the witness with all available contradictory evidence.

In recognizing these factors that distinguish the grand jury context from the trial

---

**4.** In recommending Rule 804(b)(1), the Advisory Committee discussed the offeror of testimony at the prior proceeding in terms primarily applicable to trials and did not discuss at all the situation where the prior proceeding was a grand jury. Recognizing the difficulty of fashioning the proper approach where testimony is offered at a subsequent proceeding against a party who had offered the testimony at a prior proceeding, the Committee suggested recognizing "direct and redirect examination of *one's own witness* as the equivalent of cross-examining an opponent's witness." Fed.R.Evid. 804 advisory committee's note (emphasis added), *reprinted in* 28 U.S.C.A.Fed.R.Evid., Rules 701 to end, 445, 447 (West 1984). It will not always be accurate to characterize every grand jury witness as the prosecutor's "own" witness.

context, we do not accept the position, urged by the Government upon the Supreme Court, that a prosecutor "generally will not have the same motive to develop testimony in grand jury proceedings as he does at trial." *See Salerno,* —— U.S. at ——–——, 112 S.Ct. at 2508–09. Though the Supreme Court declined to assess that contention and left its consideration to this Court in the first instance, we discern in its opinion a reluctance to engraft any general exception onto Rule 804(b)(1). "This Court cannot alter evidentiary rules merely because litigants might prefer different rules in a particular class of cases." *Id.* at ——, 112 S.Ct. at 2507. Our point is simply that the inquiry as to similar motive must be fact specific, and the grand jury context will sometimes, but not invariably, present circumstances that demonstrate the prosecutor's lack of a similar motive. We accept neither the Government's view that the prosecutor's motives at the grand jury and at trial are almost always dissimilar, nor the opposing view, apparently held by the District of Columbia Circuit, that the prosecutor's motives in both proceedings are always similar, *see United States v. Miller,* 904 F.2d 65, 68 (D.C.Cir.1990). *See also United States v. Lester,* 749 F.2d 1288, 1301 (9th Cir.1984) (upholding trial judge's exercise of discretion to exclude grand jury testimony after finding testimony eligible for admission under Rule 804(b)(1)); *United States v. Young Brothers, Inc.,* 728 F.2d 682, 691 (5th Cir.) (obviating, because of harmless error, the "difficult" question whether grand jury testimony was admissible under Rule 804(b)(1)), *cert. denied,* 469 U.S. 881, 105 S.Ct. 246, 83 L.Ed.2d 184 (1984); *United States v. Klauber,* 611 F.2d 512, 516–17 (4th Cir.1979) (suggesting, but not deciding, that grand jury testimony would have been admissible under Rule 804(b)(1)), *cert. denied,* 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980).

Nor are we persuaded by the Government's contention that the absence of similar motive is conclusively demonstrated by the availability at the grand jury of some cross-examination opportunities that were forgone. In virtually all subsequent proceedings, examiners will be able to suggest lines of questioning that were not pursued at a prior proceeding. In almost every criminal case, for example, the Government could probably point to some aspect of cross-examination of an exonerating witness that could have been employed at a prior trial and surely at a prior grand jury proceeding. Though the availability of substantial ways of challenging testimony that were not pursued by an examiner is pertinent to the "similar motive" inquiry, especially when such techniques appear far more promising compared to the cross-examination undertaken, the unused methods are only one factor to be considered.[5]

The proper approach, therefore, in assessing similarity of motive under Rule 804(b)(1) must consider whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially

---

5. To the extent that our prior decision in *United States v. Serna,* 799 F.2d 842 (2d Cir.1986), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987), implies that lack of similar motive may be established simply because questioning available at a prior proceeding was not undertaken, we reject the implication. In *Serna,* the Government opposed introduction of the transcript of testimony of a co-defendant, Kenneth Chupurdy, that had been presented at Chupurdy's trial; at Serna's trial the prosecutor argued that he lacked a motive to cross-examine similar to his motive at Chupurdy's trial. Chupurdy had denied the occurrence of a crucial meeting. The *Serna* panel reasoned as follows: "[S]ince cross-examination was unlikely to shake Chupurdy's denial of such a meeting, the prosecutor, wisely, we think, chose to focus his cross-examination on [another matter], rather than to emphasize to the jury Chupurdy's denial of [the] meeting.... [T]he prosecutor had no real motive to explore Chupurdy's earlier statements." *Id.* at 849–50. In fact, the prosecutor at the first trial had a very strong motive to show that Chupurdy's denial of the meeting was false: if that meeting had not occurred, the key witness who said it did occur would have been seriously impeached, threatening the likelihood of a conviction at both Chupurdy's and Serna's trials. What the prosecutor lacked at Chupurdy's trial was not a similar motive to cross-examine but a substantial likelihood of getting Chupurdy to admit that his denial was false. To the extent that *Serna* rejected similarity of motive because of the lack of particularized cross-examination, we reject, on this in banc rehearing, its implication that the lack of such questioning negates a similar motive.

similar issue. The nature of the two proceedings—both what is at stake and the applicable burden of proof—and, to a lesser extent, the cross-examination at the prior proceeding—both what was undertaken and what was available but forgone—will be relevant though not conclusive on the ultimate issue of similarity of motive.

■ Having identified the proper approach to the determination of whether a similar motive existed, we might ordinarily remand to the District Court to apply the governing principles to the precise facts of this case. We decline to do so, however, both to avoid further delay in this already long-delayed matter and because this is the unusual case in which it can be shown beyond reasonable dispute that the prosecutor had no interest at the grand jury in proving the falsity of the witnesses' assertion that the "Club" did not exist. Two circumstances independently suffice. First, the defendants had already been indicted, and, as appellants' counsel conceded at argument, there existed no putative defendant as to whom probable cause was in issue. At most the Government had an interest in investigating further to see *whether* there might be additional defendants or additional projects within the criminal activity of the existing defendants. As to these matters, the prosecutor had no interest in showing that the denial of the Club's existence was false. The grand jury had already been persuaded, at least by the low standard of probable cause, to believe that the Club existed and that the defendants had participated in it to commit crimes. It is fanciful to think that the prosecutor would have had any substantial interest in showing the falsity of the witnesses' denial of the Club's existence just to persuade the grand jury to add one more project to the indictment.

Second, the grand jurors had indicated to the prosecutor that they did not believe the denial. The record is clear on this point. After a consultation with the grand jury, the prosecutor told Bruno, in the grand jurors' presence, that there was "strong concern on the part of the grand jury" that his testimony had "not been truthful." A prosecutor has no interest in showing the falsity of testimony that a grand jury already disbelieves.

These two circumstances dispel similarity of motive, and the absence of similar motive is not rebutted by the limited cross-examination undertaken by the prosecutor at the grand jury. A prosecutor may have varied motives for asking a few challenging questions of a grand jury witness who the prosecutor thinks is lying. The prosecutor might want to afford the witness a chance to embellish the lie, thereby strengthening the case for a subsequent perjury prosecution. Or the prosecutor might want to provoke the witness into volunteering some critical new fact in the heat of an emphatic protestation of innocence. In this case, the cross-examination that occurred does not significantly show similarity of motive. Moreover, the strong inference of dissimilarity from the two factors already discussed is powerfully reenforced by the prosecutor's careful limitation of questioning to matters already publicly disclosed, the lack of questioning on the basis of undisclosed wiretaps and reports of cooperating witnesses, and the lack of any followup in response to Bruno's generous offer to correct inaccuracies in his testimony.

Since the grand jury as fact-finder had already resolved the issue of the Club's existence in the prosecutor's favor and had announced disbelief of the witnesses' contrary statements, dissimilarity of motive is beyond dispute. The District Court's exclusion of the witnesses' grand jury testimony was therefore entirely correct, and this ground for reversal of the convictions is rejected. We therefore vacate the panel's decision and return the appeal to the panel for further consideration of the appellants' remaining contentions.

GEORGE C. PRATT, Circuit Judge, (joined by MINER and ALTIMARI, Circuit Judges), dissenting:

My views as to why the grand jury testimony of Bruno and DeMatteis should have been admitted at trial on the issue of whether or not the "Club" existed are set forth at length elsewhere. *See United States v. Salerno*, 974 F.2d 231 (2d Cir.1991). I write here to highlight what I perceive to be some

of the weak points in the position taken by the in banc majority.

Rule 804(b)(1) of the Federal Rules of Evidence would permit receipt of Bruno's and DeMatteis's grand jury testimony if the government's motive to develop the testimony before the grand jury was "similar" to its motive to challenge that testimony at trial.

On remand from the Supreme Court to decide that issue, the panel determined that the government's motive *was* similar, primarily because (1) the government had examined both Bruno and DeMatteis extensively on whether a "Club" existed, (2) the government had vigorously examined both witnesses before the grand jury, and (3) the government was seeking at trial to prove the same issue as before the grand jury—the existence of a "Club" of concrete contractors. 974 F.2d at 240–41. The panel sought to apply the plain meaning of "similar motive" as used in rule 804(b)(1), and sought the administrative ease of determining that issue based on what the prosecutor actually did, on the record, before the grand jury.

The in banc majority, however, now concludes, as a matter of law, that the prosecutor's motive was not "similar". In doing so, it applies a gloss to the language of the rule that would find a similar motive only when the party against whom the testimony is offered had "an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue". Op. at 915. As a practical matter, the gloss effectively rewrites the rule from "similar motive" to "same motive".

Not only is the majority's test more stringent than the rule itself, it could also prove to be extremely difficult to administer, for on its face this test would require the district judge to compare the "intensity of interest" that the prosecutor possessed before the grand jury with his "intensity of interest" at the trial. Careful examination of those two states of the prosecutor's mind would require a district judge to conduct an evidentiary hearing not only into what information was available to the prosecutor at the two different times, but also into what he was thinking about that information at both of those times.

The majority sidesteps the problem in this case, however, by accepting at face value the prosecutor's *post hoc,* self-serving, un-cross-examined statements as to his own motives, and concluding, as a matter of law, that his motives at the two proceedings were not "similar". At the very least, this issue of fact should be decided in the first instance by a district judge, not an in banc appellate court.

One final, troubling aspect of the majority's decision is its acceptance of and reliance on the prosecutor's assertions that he already had an indictment against the defendants, that no new defendants were being contemplated at the time these witnesses were examined, and that, as a result, probable cause was not even an issue before the grand jury when Bruno and DeMatteis were testifying. If all these things were true, then why was the prosecutor using the grand jury at all? Could it have been simply a discovery device to develop more evidence to present at trial on the indictment he already had? If that were the case, however, the prosecutor's continuing use of the grand jury would have been improper. *See United States v. R. Enterprises, Inc.,* 498 U.S. 292, 299, 111 S.Ct. 722, 727, 112 L.Ed.2d 795 (1991) ("Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass."); *In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Simels),* 767 F.2d 26, 29 (2d Cir.1985) ("The law is settled in this circuit and elsewhere that '[i]t is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial.'") (quoting *United States v. Dardi,* 330 F.2d 316, 336 (2d Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964)); *see also* 8 James W. Moore et al., *Moore's Federal Practice* ¶ 6.04[5], at 6–106 (2d ed. 1993) ("It is not permissible for the prosecutor to subpoena and question potential trial witnesses to an existing criminal proceeding where it is the sole or dominant purpose of such questioning to obtain evidence for use in the upcoming trial. Simply stated, it is not a legitimate function of the grand jury to serve as a substitute for pretrial discovery."); 1 Charles A. Wright, *Federal Practice & Procedure* § 111.1, at 321 (1982).

The effect of the in banc majority's decision will be to leave the determination of whether grand jury testimony may be presented at trial by a defendant entirely in the prosecutor's control, a result that seems at odds with the main objective of going to trial—permitting the jury, not the prosecutor, to determine what is the truth.

Because I agree with the panel's original analysis of "similar motive" in rule 804(b)(1), I respectfully dissent.

MINER, Circuit Judge, (joined by GEORGE C. PRATT and ALTIMARI, Circuit Judges), dissenting:

I join in the dissenting opinion of Judge Pratt and add only some observations of my own in regard to the majority opinion.

The majority examines the record and finds it "beyond reasonable dispute" that the prosecution had no motive in proving at the grand jury proceedings that the two witnesses falsely denied that a bid-rigging "Club" existed. I examine the record and come to the opposite conclusion. Whatever the reason behind the strategy, the prosecution strove to establish the falsity of the testimony of Bruno and DeMatteis through the use of a number of impeaching questions that are set forth in detail in the panel opinion.

The grand jury, speaking through the prosecutor, expressed its doubts to Bruno about the truthfulness of his testimony. Specifically, after hearing the testimony and excusing him from the grand jury room, Bruno was called back to hear the prosecutor express the "strong concern" of the grand jury that his testimony had "not been truthful." Bruno then was excused. The majority makes much of these events to arrive at the conclusion that the prosecutor had no interest in showing the falsity of testimony already rejected by the grand jury. I review these events and come to the opposite conclusion. It appears to me that the announcement to the witness that the grand jury was strongly concerned about (not that it rejected) the witness' testimony was intended to invite the witness to continue to testify and, it seems obvious, to contradict his previous denial of the existence of a "Club." Indeed, the prosecutor advised Bruno to have his attorney contact the government if he wished to change any of his testimony. The prosecutor, unsurprisingly, rejected the attorney's offer to answer additional questions in writing, apparently preferring to have Bruno back under oath in order to pursue further the attack on his credibility with regard to the existence of a "Club." To me, this is strong evidence of a motive to develop testimony in greater depth regarding the bid-rigging and kickback scheme, the details of which the prosecutor sought to establish at the trial.

Finally, I do not think that it is at all "fanciful" to believe that the prosecutor had "any substantial interest in showing the falsity of the witnesses' denial of the Club's existence just to persuade the grand jury to add one more project to the indictment." Op. at 914. The government had an interest in plumbing the depths of the entire scheme to determine whether there might be additional projects or additional defendants within the purview of the existing indictment, as the majority all but concedes. The alternative, as Judge Pratt suggests, would be that the prosecutor was improperly using the grand jury for discovery purposes, a conclusion that I am not prepared to draw on the basis of the record before us.