Julian Robert PROCTOR *v*. STATE of Arkansas

CR 01-1382                                          79 S.W.3d 370

Supreme Court of Arkansas
Opinion delivered July 5 2002

*William C. McArthur*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

Annabelle Clinton Imber, Justice. After a jury trial, the appellant, Julian Robert Proctor, was convicted and sentenced to twenty years for attempted first-degree murder, fifteen years for attempted kidnapping, five years for stalking, five years for burglary, three years for terroristic threatening, and one year for third-degree battery, with the sentences to run concurrently except that the sentences for first-degree murder and attempted kidnapping were to run consecutively, for a total of thirty-five years in the Arkansas Department of Correction.[1] On appeal, Proctor raises two points of error. First he contends that the trial court erred by admitting into evidence the transcript of an officer's testimony from a bond-revocation hearing in a separate case. Second, he contends there is insufficient evidence to support his convictions. We agree that the trial court erroneously

---

[1] Fines in the total amount of $5,000 were also imposed.

admitted the transcript of the officer's testimony. However, as to all charges except attempted first-degree murder, we declare the error harmless because the evidence of guilt is overwhelming. Accordingly, we affirm those convictions, but reverse and remand the attempted-murder conviction.

## I. Facts.

The resolution of Proctor's points on appeal requires that we recite the facts of the case in some detail. On December 1, 1998, Proctor was charged with attempted first-degree murder, attempted kidnapping, and residential burglary. On June 9, 1999, the felony information was amended to add three counts of third-degree domestic battery, four counts of first-degree terroristic threatening, and one count of second-degree stalking.

Pursuant to Ark. R. Evid. 804(b)(1) (2002), the State moved, *in limine*, to allow the introduction of the transcript of Officer Burt Puckett's testimony from a bond-revocation hearing in a separate case because he was unavailable due to service in the international peace-keeping force in Kosovo, Serbia. Procter objected on several grounds: first, bond hearings and trials involve different liberty interests and standards of proof, and admission of the testimony would be prejudicial; second, Proctor had different counsel at the bond hearing who did not know about evidence affecting Officer Puckett's credibility; that is, the officer had invited the victim, Melissa Mahan, to go with him on a date prior to the arrest; third, admission of the evidence would violate the Confrontation Clause of the Sixth Amendment to the United States Constitution and Ark. R. Evid. 804(b)(1) (2001).

## A. The Bond-Revocation Hearing.

On December 8, 1998, a hearing was held to determine whether to revoke Proctor's bond resulting from a previous domestic disturbance involving him and Melissa. At that hearing, Officer Puckett testified concerning the events of November 29, 1998, that led to the instant charges. He had been assigned to conduct additional patrols of the vicinity of Melissa's residence. Around mid-morning, he drove past her residence and noticed

that her car door was open and her son was in the back seat. The boy told him that Proctor was inside the house. As the officer approached the front door, Proctor came outside. Initially, Officer Puckett spoke to Proctor in the yard. Then, after backup arrived, they moved to the officer's car, at which point Proctor stated that he just wanted to talk with Melissa for about five minutes. Officer Puckett then asked Proctor if he realized he was there unlawfully, in that he had committed burglary.

Proctor's arrest followed shortly thereafter, and he was orally advised of his *Miranda* rights at approximately 10:15-30 a.m. The officers performed a pat-down search and found duct tape, fleece gloves, canvas, a six-inch knife, handcuffs, pliers, and a flashlight. Proctor also had a Wal-Mart receipt in his wallet that indicated he had purchased the duct tape, a nylon rope, a flashlight, and the plier tool two hours earlier. The officers transported Proctor to the police station, where they mirandized him again and filled out a rights form at 12:55 p.m. Officer Puckett testified that during the custodial interview, Proctor confessed that he had pulled open the vent on top of Melissa's house and had gone into the attic to await her return. Officer Puckett also testified that Proctor said he planned to tie her up with the duct tape and handcuffs, kill her, and then kill himself. No one other than Officer Puckett was present at the custodial interview. He did not take notes or make a tape recording of the interview; rather, he wrote down his recollection of what Proctor said shortly after the interview.

Melissa also appeared at the bond hearing, but testified that Proctor did not make any threatening gestures or make statements that threatened her life or that of her child. The trial court found that Proctor had violated the terms and conditions of the bond in the earlier domestic disturbance case and revoked his bond in that case.

## B. The Pretrial Hearing.

On September 27, 1999, a pretrial hearing was held in this case in connection with the State's motion to admit the transcript of Officer Puckett's bond-hearing testimony because he was an unavailable witness. First, the prosecutor's victim-witness coordi-

nator, Charlotte Garrett Yates, testified about her attempts to contact Officer Puckett. After determining that he was in Kosovo, Serbia, she contacted Dyncorp in Fort Worth who told her she would have to go through the London, England office. The London office told her that she could not call him directly, but they would attempt to get him a message. She never heard from Officer Puckett.

Proctor argued that the bond-hearing testimony was riddled with inadmissible hearsay and its introduction would violate his right to confrontation under the U.S. Constitution. He pointed out that the hearing was for the limited purpose of bond revocation, and that the testimony elicited at the hearing was not intended to be evidentiary for trial purposes. Proctor also argued that the attorney who represented him at the bond hearing did not know about Officer Puckett's prior attempt to date Melissa and, therefore, could not have properly impeached the officer's credibility at that hearing. The prosecutor responded that the bond hearing was a reliable, full-fledged hearing and that most of the questions proffered by Proctor could be answered by other witnesses. At the conclusion of the hearing, the trial court found that Officer Puckett was unavailable to the State as a witness and granted the State's motion to admit the transcript of the officer's prior testimony.

### C. The Trial.

The first witness, Melissa Mahan, testified as follows: She met Proctor when she hired him as the night auditor at the Comfort Inn in Conway. They were each married to other people at the time, became friends, and then began having an affair from June 1997 until February 1998. On February 13, 1998, she and a girlfriend were leaving her house when Proctor drove up and blocked the drive, saying he wanted to talk. They were able to get away, but he was following them, so they went to the police station to make a report. He then showed up at Melissa's office in the Comfort Inn where he became angry and threw some things. She eventually calmed him down and he left. Because she was staying that night at the motel, she went up to her room, and the night clerk, Brandon Wittenberg, followed to make sure she was alright.

A short time later, Proctor started banging on her door. In order to avoid waking the hotel guests, she opened the door, and he punched her in the face. She told Brandon to call the police when Proctor first appeared at her door; but, Proctor told Brandon that if he went and called the police, Melissa would be dead before he got back. Proctor hit her a couple more times and kicked her in the head and back. She eventually got up from the floor and laid down on the bed. When she woke up, Brandon was gone. At some point during the night, Proctor forced her to have sex with him. For the next couple of days, he continued to follow her.

Eventually, Melissa and Proctor got back together, but split up again in mid-April. At that time, Proctor was staying with their mutual friend, Michael Phillips, so Melissa took some of his things over to Michael's apartment. When Proctor pulled up in his car and Melissa told him she was returning his things, he slapped her. She jumped in her car and left, with Proctor following in his car and Michael chasing both of them in his truck. The chase through town ended when Michael wrecked his truck.

Two months later, Proctor and Melissa moved in together, but an incident on November 15 caused them to break up again. Melissa had allegedly quit smoking. When Proctor found some cigarettes, he told her it was over. She tried to leave with her son, but Proctor took her car keys. While they fought over the keys, Melissa's son went next door to tell someone to call the police. Proctor was gone by the time the police arrived. Officer Puckett took the report and helped Melissa look for her keys. She requested additional patrols for the next couple of weeks. The next day, Officer Puckett invited her to lunch, but she declined. Melissa also acknowledged that Officer Puckett had Thanksgiving dinner at her parents house, but she stated that there was nothing going on between them.

On November 29, 1998, Melissa and her son returned home after spending the night with her parents. She had changed the locks after the last breakup with Proctor. She found the door unlocked and the light on in the bedroom. When she heard the attic door close, Melissa told her son to get back in the car and

then yelled at Proctor that she knew he was there and she was going to call the police. He jumped down from the attic, came into the living room to talk with her, and continued pleading for her to talk with him. She repeatedly told him there was nothing to talk about. When he saw the police arrive, he went outside, and Officer Puckett walked up. Melissa later saw the duct tape, gloves, knife, and handcuffs that the police had taken from Proctor.

On cross-examination, Melissa denied any romantic involvement with Brandon, but admitted that she dated Michael for a brief time. She also admitted that on the morning of November 29, she saw the door to her house close but went inside anyway. According to Melissa, Proctor made no threats or threatening moves toward her that day, and she did not feel threatened by him. Melissa did not want him arrested, still had feelings for him, and was testifying under subpoena.

The second witness was Brandon Wittenberg. He testified that while working as a night clerk at the Comfort Inn, he became friends with both Melissa and Proctor, was aware of their sexual relationship, and witnessed their arguments, some of which were physical. The worst argument he witnessed was an incident that occurred in February. Brandon corroborated Melissa's account of the events in the motel room, including Proctor telling him "if I left, it would probably be the last time I ever saw her alive[,]" and "if the police came or if I mentioned anything about calling the police that she would probably be dead before they got here[.]" He then recounted another incident caught on video tape in which Proctor kicked Melissa. On cross-examination, he conceded that the kicks did not have much force.

The third witness was Michael Phillips. He testified he was a former Comfort Inn employee. He knew both Proctor and the victim, and was aware of their relationship. On April 7, 1998, Melissa dropped some of Proctor's belongings off at Micheal's apartment. Proctor showed up, and Melissa told Michael that Proctor had slapped her. Michael then told Proctor to leave his apartment. He urged Melissa to make a police report, and headed for the police station to make sure she did. On the way, a car

chase ensued, with Proctor pursuing Melissa and Michael not far behind in his truck. The chase ended when Michael wrecked his vehicle. He and Melissa began to date shortly thereafter. On cross-examination, Michael acknowledged that he and Proctor had been friends for about ten or eleven years. He also confirmed that he had an outstanding misdemeanor warrant, but the State had made no promises in return for his testimony.

Lt. John Thessing took the report concerning the April 7, 1998 accident. During his investigation, Melissa told the officer she was having trouble with Proctor, and that Proctor had hit her several times and threatened to kill her son. However, the officer saw no marks on her that day.

Officer Christopher Padgett came in contact with Melissa on February 13, 1998, around 11:00 p.m. She came into the police station that night, complaining that Proctor would not leave her alone. Proctor walked into the police station behind her. Melissa said he had threatened both her and her son, was paging her, and was coming over to her house. Her pager displayed a row of sixes. Proctor explained to Officer Padgett that the numbers meant: "I love you to death[.]" The officer saw no signs of physical abuse at that time.

Officer James Abbey testified that he responded to a call to backup Officer Puckett at Melissa's residence on November 29, 1998. As a result of the pat-down search, he found several items on Proctor's person: a knife; a pair of handcuffs; a leatherman-type tool; duct tape; and a pair of gloves. Officer Abbey read Proctor his *Miranda* rights and placed him in the patrol car. He and Officer Puckett then walked around the house and observed mud on a railing, boot prints going up the side of the house, and a vent door on the roof that had been pried open. Later, he found Proctor's car parked a couple of blocks away, behind a dumpster. Officer Abbey was the sponsoring witness for the various exhibits. On cross-examination, he agreed that Proctor's knife was legal, as were each of the other items. However, the officer commented that while the knife could be used to skin a deer, the handcuffs and duct tape are not things one would use in the deer woods.

Officer Abbey also testified that Proctor made no threats, did not attempt to use the knife as a weapon, and was cooperative.

Finally, Detective David Berry testified that he was the lead investigator on the case and served as the sponsoring witness for the transcript of Officer Puckett's bond-hearing testimony. Following an objection by the defense, the transcript was read to the jury, with the prosecutor reading the questions and Detective Berry reading Officer Puckett's responses. On cross-examination, Detective Berry admitted that Melissa had advised the department about Officer Puckett asking her out on a date. He agreed that this was unusual behavior for an investigating officer. Although the court received the transcript of Officer Puckett's bond hearing testimony into evidence, a copy of the transcript was not given to the jury.

The State rested its case, and Proctor moved for a directed verdict on all counts. The trial court granted a directed verdict on two counts of third-degree domestic battery, but otherwise denied the motion. As the defense's only witness, Josh Edwards testified he knew Proctor and Melissa and he had never witnessed any physical violence or fights between them, or any bruising. He stated his opinion of Proctor as being a nonviolent person would not change even though Proctor had been convicted of another count of third-degree battery.

The Arkansas Court of Appeals initially heard Proctor's appeal and, in a 3-3-3 opinion, reversed and remanded on the issue of the admissibility of the bond-hearing testimony. *Proctor v. State*, 76 Ark. App. 48, 60 S.W.3d 486 (2001) (three judges found violations of both the Confrontation Clause and Ark. R. Evid. 804 (2001); whereas, three concurring judges found only a violation of Rule 804 and three dissenting judges found no violation of either Rule 804 or the Confrontation Clause). This court granted the State's petition for review. When this court grants a petition for review of a decision from the court of appeals, the findings of the trial court are reviewed as though the appeal had originally been filed with this court. *Threadgill v. State*, 347 Ark. 986, 69 S.W.3d 423 (2002).

## II. Sufficiency of the Evidence.

For double-jeopardy reasons, we consider a challenge to the sufficiency of the evidence before other points on appeal. However, in this case, the record reveals that Proctor did not renew his motion for a directed verdict at the close of all evidence. He is, therefore, procedurally barred from challenging the sufficiency of the evidence to support the verdict on appeal. "The failure to challenge the sufficiency of the evidence at both the close of the state's case and the close of all of the evidence 'will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the jury verdict.'" *Love v. State*, 324 Ark. 526, 529, 922 S.W.2d 701, 703 (1996) (citing Ark. R. Crim. P. 33.1).

## III. The Bond Hearing Testimony.

Proctor argues that the introduction of testimony from the bond-revocation hearing was improper because its admission violated both the Confrontation Clause of the United States Constitution and Ark. R. Evid. 804(b)(1) (2001). As a preliminary matter, the State contends that the Confrontation Clause challenge was not preserved for appellate review because Proctor failed to obtain a ruling on this specific issue from the trial court. We will not review a matter on which the trial court has not ruled. *Alexander v. State*, 335 Ark. 131, 133-34, 983 S.W.2d 110, 111 (1998). In order to preserve a point for appellate review, a party must obtain a ruling from the trial court. *Id.* Matters left unresolved are waived and may not be raised on appeal. *Id.*

In his response to the State's pretrial motion to admit the transcript of Officer Puckett's bond-hearing testimony, Proctor argued that its admission would violate the Confrontation Clause of the United States Constitution. At the pretrial hearing, he emphasized an additional argument: the admission of the transcript would violate Rule 804 of the Arkansas Rules of Evidence. In making its ruling, the trial court merely stated that it found Officer Puckett to be unavailable and that it would allow the transcript to be introduced at trial. In view of Proctor's two-fold argument below and the trial court's failure to specify the basis for

its ruling, we cannot say that Proctor failed to obtain a ruling on his Confrontation Clause argument.

■ The threshold argument on this point is that the State did not make a good-faith effort to procure Officer Puckett's appearance. Defense counsel, however, conceded the issue at the pretrial hearing by stating: "I understand that Mr. Clark probably has done his best to try and retrieve Mr. Puckett from Kosovo, and I — I'm sure that truly is beyond, you know, his capability at that time[.]" Accordingly, this threshold argument is not preserved for appeal.

■ ■ Both Rule 804(b)(1) and the Confrontation Clause deal with similar subject matter.

> Any study of such an evidentiary rule in connection with a criminal case must be in conjunction with the confrontation clause of the Sixth Amendment. The Sixth Amendment provides that:
>
> . . . the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . .
>
> As Justice Stewart said in *Dutton v. Evans*, 400 U.S. 74, 86 (1970), the two concepts "stem from the same roots." There has traditionally been an exception to the right of confrontation where a witness who testified at a prior trial is unavailable at a later judicial proceeding. *Mattox v. State*, 156 U.S. 237 (1895). State evidentiary rules can fall within this exception if two tests are met. First, the witness must be "unavailable." A witness is not unavailable unless the State has made a good faith effort to obtain the witness's presence at the trial. *Barber v. Page*, 390 U.S. 719 (1968). Next, the evidence must be reliable, and that is our only concern here.

*Scott & Johnson v. State*, 272 Ark. 88, 92, 612 S.W.2d 110, 112 (1981).[2] The requirements of the Confrontation Clause are met where the witness is unavailable and the transcript testimony is

---

[2] The wording of the Sixth Amendment Confrontation Clause is incorporated into the Arkansas Constitution Article 2, section 10. *See Hale v. State*, 343 Ark. 62, 83, 31 S.W.3d 850, 863 (2000) ("This court has consistently interpreted the Confrontation Clauses of the United States and Arkansas Constitutions to provide identical rights.")

reliable. *Id.*; *Scroggins v. State*, 312 Ark. 106, 848 S.W.2d 400 (1993). Officer Puckett was unavailable, serving in the Kosovo peace-keeping force. His prior testimony is reliable because it was taken under oath, before a judicial tribunal, and recorded by the court reporter. It should be noted that Proctor does not challenge the reliability of the transcript, but rather focuses on the motive for cross-examination. Thus, we hold that the constitutional requirements of the Confrontation Clause were met.

■ Rule 804(b)(1) permits the admission of former testimony under the following conditions:

> (b) *Hearsay Exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) *Former testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding a predecessor in interest, had *an opportunity and similar motive* to develop the testimony by direct, cross, or redirect examination.

Ark. R. Evid 804(b)(1) (2001) (emphasis added).[3] To be admissible under Rule 804(b)(1), the motive for developing the testimony at the bond-revocation hearing must have been similar to the motive at trial.

Proctor relies upon this court's decision in *Scott & Johnson v. State*, 272 Ark. 88, 612 S.W.2d 110 (1981), in which we focused on the nature of the two hearings. "Obviously admission depends upon the circumstances surrounding the hearing. In the case of a preliminary hearing admission depends on what kind of hearing is involved and whether it is a 'full fledged' hearing or a limited one." *Id.* at 93, 612 S.W.2d at 113. The *Scott & Johnson* court noted that the previous testimony was elicited at a probable-cause hearing with no extensive cross-examination.

> [no] motive existed to develop testimony as one would have in a trial. . . . To presume they [would have cross-examined] would be to presume they knew the testimony could be used later in the

---

[3] Fed. R. Evid. 804(b)(1) (1999) is identical to the Arkansas rule.

absence of the witness. . . . Moreover, a defendant, having no obligation to cross-examine, may for strategy's sake forego examination. The defense may not wish to disclose its theory of defense.

*Id.* at 94–95, 612 S.W.2d at 113.

In *Espinosa v. State,* 317 Ark. 198, 876 S.W.2d 569 (1994), a witness revealed evidence that had not been disclosed to the defendant, and the trial court declared a mistrial. *Id.* Prior to the second trial, the witness died, and the State sought to admit the testimony from the first trial. *Id.* In affirming the trial court's decision to admit the prior testimony, this court noted:

> After Officer Jones mentioned the marked money, Espinosa had sufficient reason and motive to cross-examine Wilkins, who also testified about the marked money and police reports before a mistrial was declared. In this connection, we recount that the trial court, after Officers Jones, Wilkins and Hart testified and before a mistrial was declared, called a recess for the express purpose of allowing Espinosa to question any relevant witness about the report and the marked money. In fact, Espinosa's trial counsel conceded that, during the called recess, he was given an opportunity to question Wilkins about everything.

*Id.* at 203, 876 S.W.2d at 571–72. We noted that Espinosa showed no prejudice from her inability to cross-examine the witness at the second trial. *Id.*

According to the defendant in *Vick v. State,* 314 Ark. 618, 863 S.W.2d 820 (1993), the testimony from a federal habeas corpus hearing should not have been admitted because it was "based on ineffective counsel at the first trial, which casts doubt on defense counsel's cross-examination[.]" *Id.* In determining that the former testimony was admissible, this court focused on the proffered questions to the absent witness, and concluded that "[a]t best, the proffered questions appear to be of marginal benefit to the appellant's cause. In sum, we conclude that the cross-examination was sufficient . . . ." *Id.* at 625, 863 S.W.2d at 823.

In *Scroggins v. State,* 312 Ark. 106, 848 S.W.2d 400 (1993), this court applied the reasoning of *Scott, supra,* and determined that former testimony from a suppression hearing was admissible.

*Id.* We held that the testimony was well-developed because of the cross-examination of the witness with the purpose to impeach the testimony on the very point at issue at trial. *Id.*

█ The State nonetheless contends it is only the opportunity to cross-examine that is critical, not a similar motive. Our case law does not support that proposition. In *Scott & Johnson,* we held that the motive to develop testimony at a probable-cause hearing was not similar to the motive to cross-examine at a trial. 272 Ark. 88, 612 S.W.2d 110. *Espinosa* involved testimony from a previous trial where the exact issue and motive to cross-examine existed. 317 Ark. 198, 876 S.W.2d 569. In *Viek,* we concluded that the cross-examination of the witness at a habeas corpus hearing was sufficient. 314 Ark. 618, 863 S.W.2d 820. Likewise, the *Scroggins* case involved a similar motive to cross-examine at a suppression hearing. It is clear that admission of prior testimony requires both the opportunity to cross-examine and a similar motive to develop the testimony. This court has consistently held that where the prior testimony was at a full-fledged proceeding, the motive to cross-examine was similar, and the witness was unavailable, the testimony was admissible under Rule 804(b)(1).

█ We note that our holding today is consistent with federal case law. When interpreting our rules of evidence, "we desire to maintain an interpretation of the Uniform Rules that is reasonably consistent with other states as well as with the Federal Rules of Evidence." *Rhodes v. State,* 276 Ark. 203, 210, 634 S.W.2d 107, 111 (1982). The United States Supreme Court specifically addressed the question of "similar motive" under Fed. R. Evid. 804(b)(1) in *U. S. v. Salerno,* 505 U.S. 317 (1992). The issue in *Salerno* concerned exculpatory grand jury testimony. The United States argued the testimony should not be introduced because a prosecutor does not have a similar motive to develop testimony in grand jury proceedings as he or she would at trial. Salerno argued, as does the State in the instant case, that a similar motive is not necessary; rather, the opportunity to cross-examine is sufficient. *Id.* The Supreme Court disagreed and held that Salerno "had no right to introduce DeMatteis' and Bruno's former testimony under Rule 804(b)(1) without showing a 'similar motive.'" *Id.* at 321–22.

■ The case was remanded for further consideration of whether the United States had a similar motive to develop the testimony before the grand jury. Sitting *in banc* on the sole issue of "similar motive," the Second Circuit Court of Appeals determined that the former testimony was properly excluded because the prosecution lacked a "similar motive." *U. S. v. DiNapoli*, 8 F.3d 909, 910 (2nd Cir. 1993) (vacating a previous three-judge panel decision, *U. S. v. Salerno*, 974 F.2d 231 (2nd Cir. 1992)). The appellate court explained:

> The proper approach, therefore, in assessing similarity of motive under Rule 804(b)(1) must consider whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue. The nature of the two proceedings — both what is at stake and the applicable burden of proof — and, to a lesser extent, the cross-examination at the prior proceeding — both what was undertaken and what was available but forgone — will be relevant though not conclusive on the ultimate issue of similarity of motive.

*Id*. at 914-15. *See also U. S. v. Fischl*, 16 F.3d 927, 928 (8th Cir. 1994).

■ As we have already mentioned, Arkansas caselaw has stressed the importance of the nature of the two proceedings. The inquiry according to this court is whether the prior proceeding was a "full fledged" hearing. *Scott & Johnson*, 272 Ark. 88, 612 S.W.2d 110. The Second Circuit set out factors to determine the similarity of the proceedings: "both what is at stake and the applicable burden of proof — and, to a lesser extent, the cross-examination at the prior proceeding — both what was undertaken and what was available but forgone . . . ." *U.S. v. DiNapoli*, 8 F.3d at 914-15. The prior testimony in this case occurred at a bond-revocation hearing. We have held that a hearing concerning revocation of a defendant's pretrial release under Ark. R. Crim. P. 9.6 (2001) is not a hearing of an adversarial nature that requires representation by counsel. *Reeves v. State*, 261 Ark. 384, 548 S.W.2d 822 (1977). In fact, such a hearing has a limited function. The sole purpose of the hearing is for the examining court to determine whether there is reasonable cause to believe that the defen-

dant has committed a felony while out on bail on another charge.[4] As such, it is analogous to a probable-cause hearing, which this court has held does not meet the "similar motive" requirement of Rule 804(b)(1). *Scott & Johnson, supra.*

It is therefore clear that what is at stake in a bond-revocation hearing is substantially different from what is at stake in a full-fledged hearing at trial. Under these circumstances, we conclude the State did not demonstrate that Proctor had a similar motive in this case in order to make use of Rule 804(b)(1). Moreover, Proctor's attorney at the bond-revocation hearing did not have the benefit of any information about Officer Puckett's romantic interest in the victim. Accordingly, we hold that Officer Puckett's testimony from the bond-revocation hearing was erroneously admitted into evidence under Ark. R. Evid. 804(b)(1).[5]

Our final inquiry is whether the error in admitting the testimony was prejudicial. An error in the admission of hearsay evidence does not automatically result in a reversal if the error was harmless. *Jones v. State*, 326 Ark. 61, 931 S.W.2d 83 (1996). Where evidence of guilt is overwhelming and the error slight, we can declare the error harmless and affirm. *Bledsoe v. State*, 344 Ark. 86, 39 S.W.3d 760 (2001). We therefore examine the evidence without Officer Puckett's testimony to determine whether the error was harmless.

### A. Third-degree Battery.

"A person commits battery in the third degree if: (1) [w]ith the purpose of causing physical injury to another person, he causes physical injury to any person . . . ." Ark. Code Ann. § 5-13-203(a)(1) - (a)(2) (Repl. 1997). Melissa and Brandon testi-

---

[4] Rule 9.6 of the Arkansas Rules of Criminal Procedure provides: "If it is shown that any court has found reasonable cause to believe that a defendant has committed a felony while released pending adjudication of a prior charge, the court which initially released him may revoke his release."

[5] Proctor also argues that having different attorneys at the prior hearing and at trial made the transcript inadmissible; however, Rule 801(b)(1) and our case law are concerned with the opportunity and motive to cross-examine the witness, not the identity of the attorney.

fied concerning the incident at the Comfort Inn in which Proctor knocked Melissa to the floor and then kicked her. Lt. Thessing testified that Melissa told him Proctor had hit her several times. This evidence is overwhelming proof that Proctor, with the purpose of causing injury to Melissa, physically injured her. Accordingly, we hold that the improper admission of Officer Puckett's testimony was harmless error as to the offense of third-degree battery.

### B. Second-Degree Stalking.

A person commits stalking in the second degree if he purposely engages in a course of conduct that harasses another person and makes a terroristic threat with the intent of placing that person in imminent fear of death or serious bodily injury or placing that person in imminent fear of the death or serious bodily injury of his or her immediate family.

Ark. Code Ann. § 5-71-229(b)(1) (Repl. 1997). Michael Phillips testified that Proctor chased Melissa in his car. Melissa herself testified that Proctor followed her in his car on several occasions, blocked her car in her drive, and threatened to kill her. Even without Officer Puckett's testimony, we conclude that the evidence of Proctor's guilt on the stalking charge is overwhelming and, thus, the improper admission of the officer's testimony was harmless as to the offense of second-degree stalking.

### C. First-Degree Terroristic Threatening.

"A person commits the offense of terroristic threatening in the first degree if . . . [w]ith the purpose of terrorizing another person, he threatens to cause death or serious physical injury or substantial property damage to another person . . . . " Ark. Code Ann. § 5-13-301(a)(1)(A) (Repl. 1997). Once again, even without Officer Puckett's testimony, the evidence of Proctor's guilt on the charge of first-degree terroristic threatening is overwhelming. Melissa testified that Proctor threatened to kill her. Brandon corroborated her testimony. Furthermore, Proctor's threats had been reported to Lt. Thessing and Officer Padgett. We conclude that the erroneous admission of Officer Puckett's testi-

mony was harmless as to the offense of first-degree terroristic threatening.

### D. Residential Burglary.

■ "A person commits residential burglary if he enters or remains unlawfully in a residential occupiable structure of another person with the purpose of committing therein any offense punishable by imprisonment." Ark. Code Ann. § 5-39-201(a)(1) (Repl. 1997). Officer Abbey observed muddy footprints leading up the side of the residence and a vent on the roof that had been pried open to allow access to the attic. According to Melissa's testimony, she had changed the locks at her residence before she returned home on November 28, 1998, only to find Proctor in the attic. This constitutes overwhelming evidence of Proctor's guilt on the residential burglary charge, provided that his purpose was to commit an offense in the residence punishable by imprisonment. Our resolution of the latter inquiry necessarily depends upon the remaining two charges of attempted kidnapping and attempted first-degree murder. There must be overwhelming evidence of either offense without Officer Puckett's testimony in order to affirm the residential burglary conviction under the harmless-error rule.

### E. Attempted Kidnapping.

(a) A person commits the offense of kidnapping if, without consent, he restrains another person so as to interfere substantially with his liberty with the purpose of:

. . .

(4) Inflicting physical injury upon him, or of engaging in sexual intercourse, deviate sexual activity, or sexual contact with him; or

(5) Terrorizing him or another person;

Ark. Code Ann. § 5-11-102(a) (Repl. 1997).

A person attempts to commit an offense if he . . . [p]urposely engages in conduct that constitutes a substantial step in a course of conduct intended to culminate in the commission of an offense . . . . Conduct is not a substantial step under this section

unless it is strongly corroborative of the person's criminal purpose.

Ark. Code Ann. § 5-3-201(a)(2) & (c) (Repl. 1997). The State had the burden of proving that Proctor intended to kidnap Melissa Mahan and that he took a substantial step toward the commission of the offense. With regard to the fact that a person's intent or purpose cannot be shown by direct evidence, we have stated:

> A person's state of mind at the time of a crime is seldom apparent. One's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence, but may be inferred from the facts and circumstances shown in evidence. Since intent cannot be proven by direct evidence, members of the jury are allowed to draw upon their common knowledge and experience to infer it from the circumstances.

*Tarentino v. State*, 302 Ark. 55, 58, 786 S.W.2d 584, 585-86 (1990) (internal citations omitted). *See also Price v. State*, 347 Ark. 708, 66 S.W.3d 653 (2002).

With regard to the substantial-step requirement, the Original Commentary to Ark. Code Ann. § 5-3-201 (Repl. 1995), includes a nonexclusive list of examples of conduct that:

> if strongly corroborative of criminal purpose, might reasonably be held by a trier of fact to be substantial steps:
>
> (1) lying in wait [for] the contemplated victim of the offense;
>
> . . .
>
> (4) unlawful entry of a structure, vehicle or inclosure in which it is contemplated that the offense will be committed;
>
> . . .
>
> (6) possession, collection or fabrication of materials to be employed in the commission of the offense, at or near the place contemplated for its commission where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

The commentary also notes that the enactment of the statute represented a change in Arkansas law "by allowing imposition of criminal liability for conduct further removed from consummation

of an offense. But it remains clear that under the Code not every act done in conjunction with the intent to commit a crime constitutes an attempt to commit the crime." *Id.* (internal citation omitted). Without Officer Puckett's testimony that Proctor confessed he was going to tie Melissa up with duct tape and handcuffs and kill her, there was no direct evidence of his intent to kidnap the victim. Therefore, the State was required to show overwhelming circumstantial evidence: (1) of his intent to restrain Melissa's liberty for the purpose of terrorizing or harming her; (2) of a substantial step toward the commission of the crime; and (3) that his actions were strongly corroborative of his criminal purpose. "We weigh the evidence in this second stage because even slight error cannot be said to be harmless in a case in which the question of guilt or innocence is a close one, but it can be in a case where the evidence of guilt is overwhelming." *Numan v. State*, 291 Ark. 22, 28, 722 S.W.2d 276, 279 (1987).

■■ ■■ The evidence supporting the verdict is as follows: A receipt from Wal-Mart indicated that Proctor had purchased duct tape, a nylon rope, a flashlight, and a plier tool two hours before breaking into Melissa's residence. Officer Abbey testified that when arrested, Proctor had a knife, a pair of handcuffs, duct tape, a leatherman-type tool, and gloves; and that he parked his car several blocks away. Proctor had broken into the attic and was hiding there. He came down from the attic in response to Melissa's threat to call the police.

■■ While the above evidence might be sufficient to withstand a substantial-evidence challenge, we must determine whether the evidence of Proctor's guilt on the attempted kidnapping charge is overwhelming. Melissa testified that after he came down from the attic, Proctor sat down in the chair and pleaded with her to talk with him. He made no threats or threatening moves toward her that day. She also testified that she was standing in the doorway of her home during this time. Officer Abbey testified that Proctor's knife was legal, as were the other items; that he made no threats, did not attempt to use the knife as a weapon, and was cooperative. Because the circumstantial evidence of Proctor's intent to restrain Melissa's liberty for the purpose of terrorizing or harming her was not overwhelming, we cannot say the

admission of Officer's Puckett's testimony was harmless. We therefore reverse Proctor's conviction on the charge of attempted kidnapping.

### F. Attempted First-Degree Murder.

"A person commits murder in the first degree if . . . [w]ith a purpose of causing the death of another person, he causes the death of another person . . . ." Ark. Code Ann. § 5-10-102(a)(2) (Repl. 1997). Once again, section 5-3-201(a)(2) states that a person commits the criminal act of attempt when he "purposely engages in conduct that constitutes a substantial step in a course of conduct intended to culminate in the commission of an offense . . . ." Here, the State had the burden of proving that Proctor intended to murder Melissa and that he took a substantial step toward the commission of the offense. As with the attempted-kidnapping offense, the State had no direct evidence of Proctor's intent to commit murder without the testimony of Officer Puckett. We must, therefore, consider whether there was overwhelming proof in the form of circumstantial evidence that Proctor intended to murder Melissa.

Several witnesses testified concerning a history of domestic abuse and threats. Melissa testified about the pattern of abuse, the threats, the stalking, and the incident on November 29, 1998. Brandon told the jury about the physical abuse in February 1998, including Proctor's threats to kill Melissa. Michael testified concerning the physical abuse and Proctor's obsessive behavior. Officer Padgett confirmed that Melissa made reports of domestic abuse. He also testified that a message from Proctor to Melissa consisting of sixes across her pager meant "I love you to death." Finally, evidence regarding Proctor's purchase and possession of the crime tools, the break-in, and the hiding of his car were introduced through Officer Abbey.

The testimony summarized above, although sufficient to meet "the substantial step" element of attempted murder, does not constitute overwhelming evidence of Proctor's intent to murder Melissa on November 29, 1998. The pager message could be evidence of something other than a death threat. Melissa herself

did not feel threatened by Proctor during the incident; nor did he attempt to flee when confronted by Melissa and the police. In fact, Proctor was cooperative and did not resist arrest. While the tools found in Proctor's possession were indicative of an intent to restrain Melissa's liberty, we cannot say that the evidence, without the testimony of Officer Puckett, was overwhelming proof of Proctor's intent to murder Melissa. We therefore reverse Proctor's conviction on the charge of attempted first-degree murder.

Because we have reversed the convictions for attempted kidnapping and attempted first-degree murder, the conviction for residential burglary must also be reversed for lack of an underlying crime punishable by imprisonment, and we remand for further proceedings consistent with this opinion. However, for the reasons set forth earlier in this opinion, Proctor's convictions on the charges of stalking, terroristic threatening, and battery are affirmed under the harmless-error rule.

Affirmed in part and reversed and remanded in part.

GLAZE, J., dissenting in part.

TOM GLAZE, Justice, dissenting in part. While I agree with the majority opinion's statement of the law with respect to the proof needed to establish the crime of attempted kidnapping, I must respectfully dissent from the majority's conclusion that there was not overwhelming evidence of Julian Proctor's guilt on the attempted kidnapping charge. The majority correctly notes that intent can seldom be proven by direct evidence, and that it must frequently be established by circumstantial evidence. *See, e.g., Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000); *Jackson v. State*, 290 Ark. 160, 717 S.W.2d 801 (1986) (inferring from circumstantial evidence an intent to terrorize a kidnapping victim). Likewise, the majority properly states that the prosecution had to offer overwhelming circumstantial evidence of three elements: 1) of Proctor's intent to restrain Melissa's liberty for the purpose or terrorizing or harming her; 2) of a substantial step toward the commission of the crime; and 3) that his actions were strongly corroborative of his criminal purpose.

However, I disagree with the majority's application of these rules to the facts presented in the case at hand. Evidence of Proctor's intent to restrain Melissa can be found in the fact that he had handcuffs and duct tape — items that can be employed to restrain another — in addition to a knife. Next, evidence of a substantial step toward the commission of the crime can be seen in his breaking into her home. *See* subsection (4) of the Original Commentary to Ark. Code Ann. § 5-3-201 (Repl. 1995). Finally, Proctor's actions were strongly corroborative of his criminal purpose. After breaking into Melissa's house, he waited in her attic, in possession of a knife (as well as the other items discussed above) for her to come home. Clearly, Proctor was not in her attic planning to bake cookies. I would hold that the foregoing constitutes overwhelming evidence of Proctor's guilt on the attempted kidnapping charge.