Alvis E. DOWTY  *v.*  STATE of Arkansas

CR 04-1328                                    210 S.W.3d 850

Supreme Court of Arkansas
Opinion delivered June 23, 2005

*Miller Law Firm,* by: *Leslie Borgognoni,* and *Randel Miller,* for appellant.

*Mike Beebe,* Att'y Gen., by: *Lauren Elizabeth Heil,* Ass't Att'y Gen., for appellee.

JIM HANNAH, Chief Justice. Appellant Alvis E. Dowty was convicted in Craighead County Circuit Court of one count of possession of methamphetamine with intent to deliver, for which he was sentenced to a term of fifteen years' imprisonment and a fine in the amount of $10,000; one count of possession of drug paraphernalia with intent to use, for which he was sentenced to a term of three years' imprisonment and a fine of $2500; and one count of possession of a controlled substance, for which he was fined $100. The circuit court ordered that the sentences run concurrently. On appeal, Dowty argues that the circuit court erred in denying his motion to suppress evidence obtained as a result of a warrantless search in connection with a dog sniff. We find no error and, accordingly, we affirm. Our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(b)(5).

The testimony at Dowty's suppression hearing reveals the following facts. Wes Baxter, a deputy sheriff with the Craighead County Sheriff's Department testified that both he and the Drug Task Force had received information that Dowty and two other individuals, April Thorn and Sherry Buckelew, were involved in the manufacture and sale of methamphetamine. Baxter testified that he had received information that Dowty manufactured methamphetamine at his residence in Tennessee and brought large quantities to the Jonesboro area, where he, Thorn, and Buckelew sold it. Baxter said that the three were allegedly selling some of the methamphetamine at a trailer on County Road 318. In addition, Baxter stated that he had information that Dowty was driving a black Suburban "and that there may be rental vehicles involved as well."

On March 16, 2004, at around 2:15 p.m., Baxter, who was not on duty, was driving near County Road 318, when he observed Dowty and an individual Baxter believed to be April Thorn, driving a black Suburban and a black Grand Am, respectively. Baxter testified that it is common for those involved in drug trafficking to use rental cars for transporting drugs to avoid having their personal vehicles seized during a drug arrest. He further testified that at the time he observed the vehicles, he noticed that the Grand Am bore a green "Enterprise" sticker.

After observing Dowty and Thorn, Baxter contacted Jerry Roth, a fellow deputy sheriff and member of the Drug Task Force. Baxter told Roth what he had observed and continued to follow the couple. Baxter observed the two pull their cars beside each other in the parking lot of an Outback Steakhouse, talk for about five minutes, and leave the parking lot. The two then drove north on Southwest Drive, with Baxter following. Shortly thereafter, Roth and another officer, Investigator Lane, began to follow Dowty and Thorn, and Baxter discontinued his surveillance. Roth testified that prior to March 16, 2004, he had received information that Dowty was involved in trafficking and distributing large amounts of methamphetamine in the area. Further, Roth stated that the Drug Task Force had "information . . . that Mr. Dowty was bringing large quantities of crystal into Craighead County, staying at some of the local motels such as the Park Place Inn and also staying at Sherry Buckelew's residence out on 318."

Roth testified that he saw the couple park their cars beside each other in the parking lot of a Western Sizzlin and walk into the restaurant. At that point, Roth contacted Investigator John McGee and asked him to go inside the restaurant to observe Dowty and Thorn. Roth also contacted Brett Duncan, a canine officer with the sheriff's department, and asked Duncan to bring his drug-sniffing dog Raid to their location.

Duncan testified that when he arrived at the Western Sizzlin, he walked Raid around the Suburban first, beginning with the passenger's side. Raid put his nose in the seam of the passenger door of the Suburban and began breathing hard; however, Raid did not alert on the vehicle. Immediately thereafter, Raid turned his attention to the Grand Am and alerted on the passenger's side of that vehicle. Duncan testified that he told Roth that Raid alerted on the Grand Am and "showed interest" in the Suburban. Duncan also stated that he did not complete the "sniff" of the Suburban because he believed that if Dowty and Thorn walked

out of the restaurant and saw him there with Raid, the two might not return to their vehicles. Duncan took Raid back to the patrol car, and he and the other officers waited for the couple to emerge from the restaurant.

Dowty and Thorn walked out of the restaurant about five minutes after the dog sniff. Thorn opened the door of the Grand Am and sat inside while Dowty stood beside the car and talked to her. Roth and Lane approached the couple and identified themselves, followed by Duncan and McGee. Duncan informed Thorn that his dog had alerted on her vehicle and that he wanted to conduct a search. Duncan searched the Grand Am and discovered methamphetamine. Thorn was then placed under arrest.

After Thorn was arrested, Roth spoke to Dowty, advising him that Thorn had been arrested because drugs had been found in her car. Roth said that Dowty asked him, "What does this have to do with me?" Roth then asked Dowty if he had come to the restaurant with Thorn, and Dowty denied being there with her. Roth then told Dowty that police officers had observed the two at the Outback Steakhouse parking lot and followed them to the Western Sizzlin parking lot. After learning this, Dowty admitted that he had been following Thorn.

While Roth was speaking with Dowty, Duncan retrieved Raid to complete the sniff of the Suburban. Raid alerted on the front-passenger door. Officers conducted a search of Dowty's vehicle and found methamphetamine, a defaced handgun, digital scales, and other items of drug paraphernalia on the driver's side of the Suburban. As a result of the evidence recovered during the search, Dowty was arrested.

At the suppression hearing, Dowty argued that the canine sniff of his vehicle and the subsequent search of his vehicle by officers was an unreasonable search and seizure in violation of the Fourth Amendment and Article 2, § 15 of the Arkansas Constitution. He further argued that he was detained upon his initial contact with the officers, and that because nothing prior to that point gave rise to reasonable suspicion that he was engaged in illegal activity, the detention was unreasonable. Additionally, Dowty argued that even if the detention and second dog sniff were justified, the officers did not have probable cause for a warrantless search and, as such, prior to conducting a search, the officers should have presented the facts to a magistrate for a probable-cause determination.

The circuit court found that prior to Raid's alert on the Suburban, Dowty was not detained. Further, the circuit court found that under the Fourth Amendment, reasonable suspicion is not required prior to conducting a canine sniff of a vehicle. The circuit court also found that once the second canine sniff was completed, the officers were not required to obtain a search warrant to search Dowty's vehicle.

On appeal, Dowty argues that the circuit court erred in (1) finding that he was not detained and was free to leave under the Fourth Amendment, the Arkansas Constitution, and the Arkansas Rules of Criminal Procedure; and (2) finding that the two canine sniffs were not a search under Arkansas law and "that the conflicting sniff results were probable cause to conduct a warrantless search that resulted in contraband being discovered in yet a different enclosed area of the vehicle." In reviewing the trial court's denial of a motion to suppress evidence, we conduct a *de novo* review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Sims v. State*, 356 Ark. 507, 157 S.W.3d 530 (2004).

Dowty begins his argument by contending that under both the United States Constitution and the Arkansas Constitution, police officers had no legal basis for contact or reasonable suspicion to conduct the first dog sniff. In *Sims*, we held that a canine sniff of the exterior of a vehicle is not a Fourth Amendment search. 356 Ark. at 515, 157 S.W.3d at 536 (citing *United States v. Place*, 462 U.S. 693 (1983) (concluding that a dog sniff is "*sui generis*").[1] *See also United States v. Friend*, 50 F.3d 548 (8th Cir. 1995), *vacated and remanded on other grounds*, 517 U.S. 1152 (1996) (stating that a dog sniff of a car parked on a public street or alley does not amount to a search under the Fourth Amendment); *United States v. Ludwig*, 10 F.3d 1523 (10th Cir. 1993) (holding that random and suspicionless dog sniff of vehicles in motel parking lot was not a search subject to Fourth Amendment); *Horton v. Goose*

---

[1] The court of appeals has similarly held that a dog sniff of the exterior of a vehicle does not amount to a Fourth Amendment search. *See Miller v. State*, 81 Ark. App. 401, 102 S.W.3d 896 (2003); *Willoughby v. State*, 76 Ark. App. 329, 65 S.W.3d 453 (2002); *Vega v. State*, 56 Ark. App. 145, 939 S.W.2d 322 (1997).

*Creek Indep. Sch. Dist.*, 690 F.2d 470 (5th Cir. 1982) (stating that dog sniffs of vehicles on public parking lot of school are not a search within the purview of the Fourth Amendment); *State v. McMillan*, 23 Kan. App.2d 100, 927 P.2d 949 (1996) (holding that the dog sniff of vehicle parked in public parking lot did not constitute a "search" under the Fourth Amendment); *State v. Garcia*, 195 Wis. 2d 68, 535 N.W.2d 124 (1995) (holding that the dog sniff of exterior of car parked in motel parking lot is not a search under the Fourth Amendment because there is no legitimate expectation of privacy around air space of a car in a public parking lot). Where there is no "search" within the meaning of the Fourth Amendment, no reasonable suspicion is necessary to justify having the dog smell appellant's vehicle. *See Vega v. State*, 56 Ark. App. 145, 148, 939 S.W.2d 322, 323 (1997). Thus, Dowty's Fourth Amendment argument regarding the first sniff must fail.

Dowty also argues, as he did below, that the canine sniff and subsequent search of his vehicle was unreasonable under Article 2, § 15 of the Arkansas Constitution. However, Dowty failed to obtain a ruling on this issue. The circuit court specifically cited the Fourth Amendment in its ruling; however, it made no finding with respect to the Arkansas Constitution.

We will not review a matter on which the trial court has not ruled. *Proctor v. State*, 349 Ark. 648, 79 S.W.3d 370 (2002). In order to preserve a point for appellate review, a party must obtain a ruling from the trial court. *Id.* Matters left unresolved are waived and may not be raised on appeal. *Id.* Because Dowty failed to obtain a ruling on his argument under the Arkansas Constitution, this court will not address it on appeal.

We now turn to the second dog sniff, which took place after Dowty and Thorn exited the restaurant and returned to the parking lot. Dowty contends that he was detained from the moment the police first made contact with him and Thorn outside the restaurant. He contends that because nothing prior to that point gave rise to reasonable suspicion that he was engaged in illegal activity, the detention was unreasonable. The State maintains that Dowty was not seized during his initial contact with the police. Alternatively, the State argues that even assuming that Dowty was seized when he emerged from the restaurant, the seizure was reasonable because it was supported by reasonable suspicion that he was engaged in drug-related activity.

Police–citizen encounters have been classified into three categories. *Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002). The first and least intrusive category is when an officer merely approaches an individual on a street and asks if he is willing to answer some questions. *Id.* Because the encounter is in a public place and is consensual, it does not constitute a "seizure" within the meaning of the Fourth Amendment. *Id.* The second police encounter is when the officer may justifiably restrain an individual for a short period of time if they have an "articulable suspicion" that the person has committed or is about to commit a crime. *Id.* The initially consensual encounter is transformed into a seizure when, considering all the circumstances, a reasonable person would believe that he is not free to leave. *Id.* The final category is the full–scale arrest, which must be based on probable cause. *Id.*

Dowty contends that his encounter with the police falls into the second police–citizen category. He further argues that his encounter amounted to a seizure because he was not free to leave. In order to determine whether the initial encounter between Dowty and the police officers rose to the level of a Fourth Amendment seizure, the critical test is whether, taking into account all circumstances, the police conduct would have communicated to a reasonable person "that he was not at liberty to ignore the police presence and go about his business." *Scott*, 347 Ark. at 777-78, 67 S.W.3d at 574 (citing *Florida v. Bostick*, 501 U.S. 429 (1991)). A seizure does not occur simply because a police officer approaches an individual and asks a few questions. *Scott, supra* (citing *Florida v. Bostick, supra*). A seizure occurs when a reasonable person would not feel "free to leave." *Scott, supra* (citing *Michigan v. Chesternut*, 486 U.S. 567 (1988)).

Dowty contends that "[a]person accosted by four officers, implicated in a crime, having been told that he has been under surveillance, hearing an officer instruct another to conduct a dog sniff search, and witnessing an officer undertake to conduct such a dog search, simply could not reasonably believe that he could merely ignore the police, hop in his car before the dog alerts, and leave." We conclude that after Dowty asked the officers what the investigation of Thorn had to do with him, and he was not informed that he could leave, it was reasonable for him to believe that he was being detained. Therefore, we hold that the circuit court erred in finding that Dowty was not detained until *after* the

police conducted the second dog sniff. However our inquiry does not end here. We must determine whether the officers justifiably detained Dowty prior to and until the dog could perform the dog sniff. The question is whether the officers had reasonable suspicion to detain Dowty. Rule 3.1 of the Arkansas Rules of Criminal Procedure provides:

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation or of damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

"Reasonable suspicion" is defined as ". . . a suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion." Ark. R. Crim. P. 2.1. "Whether there is reasonable suspicion depends on whether, under the totality of the circumstances, the police have specific, particularized, and articulable reasons indicating the person may be involved in criminal activity." Smith v. State, 343 Ark. 552, 570, 39 S.W.3d 739, 750 (2001).

In addition, the Arkansas legislature has codified factors to be considered when determining whether an officer has grounds to "reasonably suspect" a person is subject to detention pursuant to Rule 3.1. These factors include, but are not limited to, the following:

(1) The demeanor of the subject;

(2) The gait and manner of the subject;

(3) Any knowledge the officer may have of the suspect's background or character;

(4) Whether the suspect is carrying anything, and what he is carrying;

(5) The manner in which the suspect is dressed, including bulges in clothing, when considered in light of all of the other factors;

(6) The time of the day or night the suspect is observed;

(7) Any overheard conversation of the suspect;

(8) The particular streets and areas involved;

(9) Any information received from third persons, whether they are known or unknown;

(10) Whether the suspect is consorting with others whose conduct is "reasonably suspect";

(11) The suspect's proximity to known criminal conduct;

(12) Incidence of crime in the immediate neighborhood;

(13) The suspect's apparent effort to conceal an article;

(14) Apparent effort of the suspect to avoid identification or confrontation by the police.

Ark. Code Ann. § 16-81-203 (1987).[2] The procedural rules are to be examined in light of the totality of the circumstances. *Potter v. State*, 342 Ark. 621, 30 S.W.3d 701 (2000).

Dowty contends that in this case, the officers had no reason to detain him pursuant to Rule 3.1 because they clearly knew his identity and, thus, did not did need to detain him to verify his identity. Further, Dowty states that the officers knew the lawfulness of his conduct, in that each testified that they had not observed him engaging in any criminal activity. Dowty maintains that the

---

[2] This statute was amended in the current General Session by Act 1994 of 2005. Subsection 14 of the statute will now read:

(14) Apparent effort of the suspect to avoid identification or confrontation by a law enforcement officer.

officers originally had no reasonable suspicion to come into contact with his vehicle, and that following the canine's failure to alert on his vehicle during the first sniff, the officer had no reasonable suspicion to approach, to stop, or to detain him.

Dowty appears to contend that a law enforcement officer may detain a person pursuant to Rule 3.1 only if the officer witnesses the person engaging in criminal activity. Dowty is mistaken. Rule 3.1 provides that an officer may detain a person if he reasonably suspects that person is committing, has committed, or is about to commit a felony. While the officers may not have observed Dowty engaging in criminal activity, we believe that under the totality of the circumstances, the officers had specific, particularized, and articulable reasons indicating that Dowty may be involved in criminal activity.

The testimony at the suppression hearing revealed that police officers had information that Dowty and Thorn, along with other individuals, were involved in trafficking and distributing large amounts of methamphetamine in the area. *See* Ark. Code Ann. § 16-81-203(3), (9) (1987). Further, Baxter testified that he had information that Dowty was driving a black Suburban and that rental vehicles might also be involved in the drug trafficking.[3] Consistent with this information, Baxter observed Dowty driving a Suburban while following a Grand Am bearing an "Enterprise" sticker. From his experience as a police officer, Baxter knew that those involved in drug trafficking frequently use rental cars to avoid seizure of their personal vehicles in the event of a drug arrest. Given that Thorn and Dowty followed each other in their vehicles, stopped and talked for about five minutes in the Outback Steakhouse parking lot, and continued on to Western Sizzlin, where they parked beside each other and walked inside the restaurant, it was reasonable for officers to believe that the two had a common purpose. Duncan's dog alerted on Thorn's Grand Am and a subsequent search of her vehicle revealed methamphetamine. Dowty's obvious association with Thorn and his proximity to Thorn's vehicle provided additional reasons to suspect he was engaged in illegal activity. *See* Ark. Code Ann. § 16-81-203(10), (11) (1987). Further, Duncan testified that Raid showed interest in

---

[3] Dowty does not question the credibility of the officers, nor does he contend that the information obtained by the Drug Task Force was unreliable.

the Suburban during the uncompleted first dog sniff. The totality of the circumstances indicate that officers had reasonable suspicion to detain Dowty when he and Thorn emerged from the restaurant.

Finally, Dowty appears to argue that the two "conflicting" sniffs cannot form the basis for reasonable suspicion to search a vehicle. He states:

> In this case, the dog did not alert during the first sniff of Dowty's vehicle. During the second sniff of Dowty's vehicle, the dog alerts. Based on conflicting sniffs, a warrantless search was conducted of Dowty's vehicle. No contraband was found where the dog had alerted on the vehicle. Thus, the alert clearly did not signal hidden contraband, and cannot be described as "*sui generis*," but an intrusion upon legitimate privacy interests protected under the Arkansas Constitution, Article 2, § 15, our statutes and rules of procedure. The alert, by "error" of the animal, or clues of the police handler, is simply means to justify a full-scale warrantless search, utterly unsupported by probable cause, or even reasonable suspicion. Appellant contends that after the first failed alert, and following the second sniff and alert; that the officers were required to present this conflicting information to a judge before conducting a warrantless search. Clearly, the canine's reliability is in question, and reliability cannot be properly assumed to justify such an invasion of privacy merely because the dog has a "certificate." The State failed to establish the reliability of the dog, which should be required to establish probable cause.[4] Moreover, the State failed to establish the dog is trained to alert *only to* contraband items, as opposed to non-contraband odors and pseudo-drugs. Just as the smell of a legal chemical which is used to produce a drug is not probable cause when smelled by an officer, so it should be with the animal, particularly one that has not been proved reliable.

---

[4] At the suppression hearing, Duncan testified that Raid is a German Shepard imported from Germany, where he had already been trained to detect narcotics. Duncan further stated that both he and Raid had attended an eighty-hour patrol and narcotics school and passed the test at its conclusion. Certificates reflecting attendance and satisfactory completion of the course were admitted at the hearing. In *Laime v. State*, 347 Ark. 142, 159-60, 60 S.W.3d 464, 476 (2001), we noted that the Eighth Circuit Court of Appeals held, "To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs. An affidavit need not give a detailed account of the dog's track record or education." *Id.* (quoting *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) (cases omitted).

At the suppression hearing, Dowty's only challenge to Raid's reliability was that the dog's failure to alert during the first sniff deprived officers of reasonable suspicion for detention. He did not argue, as he appears to argue here, that the questionable reliability of drug-sniffing canines undermines the conclusion that sniffs only detect contraband where there is no legitimate expectation of privacy. Nor did he argue that the questionable reliability of drug-sniffing canines in general warrants a broader interpretation of Article 2, § 15 of the Arkansas Constitution, regarding canine sniffs. This court has repeatedly stated that we will not address arguments, even constitutional arguments, raised for the first time on appeal. *Travis v. State*, 328 Ark. 442, 944 S.W.2d 96 (1997).

Affirmed.

BROWN, J., concurring.

ROBERT L. BROWN, Justice, concurring. The scope of the majority opinion is troubling. For the first time, this court considers the question of whether a dog sniff can be conducted on a vehicle parked in a public parking area at a restaurant, when the information received about the owner of the vehicle and methamphetamine manufacture was an unsubstantiated tip. On this point, Craighead County Deputy Sheriff Jerry Roth admitted that the information he had received about methamphetamine manufacture and Thorn and Dowty could have been true or it could have been a lie. Nevertheless, the majority concludes that based on a tip that Thorn was somehow involved in the manufacture of methamphetamine, police officers could run a dog around her Grand Am vehicle to sniff for drugs. This was done even though the police officers did not have reasonable suspicion to detain Thorn for a canine sniff. Furthermore, the sniff was not conducted in connection with a valid traffic stop.

Despite this absence of reasonable suspicion, the majority approves the canine sniff of Thorn's Grand Am merely because it was parked in a restaurant parking lot which was open to the public. Thus, there was no reasonable expectation of privacy, according to the majority. Under this reasoning, all vehicles parked in public places will be subject to a canine sniff based on anonymous tips.

The United States Supreme Court recently spoke on canine sniffs in the case of *Illinois v. Caballes*, 125 S.Ct. 834 (2005). In that

case, a canine sniff was approved by the Court, but only because it occurred pursuant to a "lawful traffic stop" and because the entire incident occurred in less than ten minutes. While one police officer was in the process of writing Caballes a warning ticket in his police car, a second police officer, who had heard about the stop on his police radio, ran his dog. The *Caballes* court also made the point that there is no legitimate privacy interest in illegal drugs protected by the U.S. Constitution. In the case before us, there was no lawful traffic stop and no reasonable suspicion to detain Thorn to activate the canine sniff of her Grand Am. It was primarily that sniff and the resulting methamphetamine that was found in her vehicle that gave the police officers reasonable suspicion to detain Dowty and conduct a similar canine run around his car. The Dowty search is a classic example of the fruit of the poisonous tree.

In this case, it is important to emphasize that we are not talking about a general canine sweep on a public lot where explosives, chemicals, or other substances for mass destruction are the subject of the sweep. That would be categorically different from what we face in this case, and I would not hesitate to affirm dog sniffs in those cases based on the risk involved. Here, the subject is methamphetamine, and more than an unsubstantiated tip should be required before a drug sniff can be conducted in a public parking lot. Surely that was the case in *Caballes v. Illinois, supra*, where a valid traffic stop was already underway and Caballes was already reasonably detained.

Having said that, I agree with the majority that federal courts have said that there is no reasonable expectation of privacy for cars parked on public streets. *See, e.g., United States v. Friend*, 50 F.3d 548 (8th Cir. 1995), *vacated and remanded on other grounds* 517 U.S. 1152 (1996). I also agree that this court's jurisprudence has cited federal case law that supports the proposition that a canine sniff of the exterior of a vehicle is not a search. *See, e.g., Sims v. State*, 356 Ark. 507, 157 S.W.3d 530 (2004).

My preference, however, is to require more in the way of reasonable suspicion than an unsubstantiated tip before dogs can be walked around cars in public parking lots. Having said that, I recognize that federal case law appears to sanction random, even suspicionless, searches of cars parked in public places. *See, e.g., United States v. Friend*, 50 F.3d 548 (8th Cir. 1995) (search warrant executed at clubhouse resulted in methamphetamine found on Friend's person; dog sniff of Friend's car in alley behind clubhouse

not a search and expectation of privacy did not extend to dog sniff); *United States v. Ludwig*, 10 F.3d 1523 (10th Cir. 1994) (Boarder Patrol's random use of drug dog for cars at a motel generally known as a staying area for smugglers not a Fourth Amendment violation because there is no legitimate expectation of privacy); *Horton v. Goose Creek Independent School Dist.*, 690 F.2d 470 (5th Cir. 1982) (*per curiam*) (dog sniff of student lockers and cars on school parking lot not a Fourth Amendment search). In *Friend*, the Eighth Circuit couched its opinion in terms of no privacy rights in a publicly parked vehicle as opposed to a justifiable dog sniff of Friend's car after finding drugs on his person.

Perhaps at a later date the United States Supreme Court will speak further on this issue or the issue will be preserved under our State Constitution for our consideration. Until then, federal case law appears to support the majority opinion. For that reason, I concur.